Argued and submitted January 30, 1986, reassigned April 1, admission to the Oregon
State Bar denied April 29, 1987

In the Matter of the Application for Admission to
the Oregon State Bar of

DAVID SYLVAN FINE,
*Petitioner.*

(SC S31159)

736 P2d 183

Don H. Marmaduke, Portland, argued the cause for petitioner. With him on the petition and reply brief was Susan D. Marmaduke, Portland.

Jeffrey M. Kilmer, Portland, argued the cause for the Oregon State Bar. With him on the brief was George A. Riemer, General Counsel, Oregon State Bar, Portland.

Carl G. Kiss, Portland, filed a brief *amicus curiae* on behalf of ACLU of Oregon.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson and Jones, Justices.

PER CURIAM

## PER CURIAM

David Sylvan Fine applies to this court for admission to the Oregon State Bar. The applicant graduated from the University of Oregon Law School in May 1984 and applied for admission to the Oregon State Bar after passing the bar examination. The Board of Bar Examiners recommended to this court that applicant's admission be denied on the ground that he had failed to show good moral character. Applicant petitioned this court to review that recommendation. We referred the matter to the Disciplinary Board for a hearing to inquire into applicant's moral character and general fitness to practice law.

A trial panel of the Disciplinary Board recommended that applicant's request for admission to the Oregon State Bar be denied. We agree based on our *de novo* review of the record, ORS 9.539, and deny applicant's petition to be admitted to the Oregon State Bar.

## STANDARD FOR ADMISSION

ORS 9.220, the general requirements for admission, provides in relevant part:

"An applicant for admission as attorney must apply to the Supreme Court and show that the applicant:

"(1)    Is at least 18 years old, which proof may be made by the applicant's affidavit.

"(2)(a)    Is a person of good moral character.

"(b)    For purposes of this section and ORS 9.025, 9.070, 9.110, 9.130, 9.210, 9.250, 9.527 and 9.545, the lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation. The conduct or acts in question should be rationally connected to the applicant's fitness to practice law."

ORS 9.250 states:

"If an applicant for admission as an attorney is found qualified, the court shall administer an oath to the applicant, that in the practice of law the applicant will support the Constitution and laws of the United States and of this state, and be of faithful and honest demeanor in office. The court shall then direct an order to be entered to the effect that the

applicant is a resident of this state, of the age of 18 years, of good moral character, and possesses the requisite learning and ability to practice as an attorney in all the courts of this state, and has taken the oath of office. Upon the entry of the order, the applicant is entitled to practice as such attorney."

The requisite burden of proof is established by BR 7.5,[1] which states:

"An applicant for admission to the practice of law in Oregon shall have the burden of establishing by clear and convincing evidence that he or she has the requisite good moral character and general fitness to practice law and that his or her admission to the practice of law in this state will not be detrimental to the administration of justice or the public interest."

The question is whether applicant is presently of good moral character. Evidence of past acts or conduct may be relevant to that issue if rationally connected to applicant's fitness to practice law. ORS 9.220(2)(b); *see also Schware v. Board of Bar Examiners,* 353 US 232, 77 S Ct 752, 1 L Ed 2d 796 (1957). The statutory and administrative rules for admission to practice law in Oregon conform to the constitutional standard established by *Schware.*

BR 7.5 requires that an applicant establish by clear and convincing evidence that he or she has the requisite good moral character and general fitness to practice law, and that admission to the practice of law in this state will not be detrimental to the administration of justice or the public interest. The second part of BR 7.5 is not in issue in this case.[2]

---

[1] Applicant raises many legal challenges to this test. Our findings in this matter would be the same even if the Oregon State Bar had the burden to prove applicant's unfitness to practice law by clear and convincing evidence.

[2] This second part has been criticized by a commentator, as follows:

"This second * * * rationale for character screening rests on the bar's own interest in maintaining a professional community and public image. In both its instrumental and symbolic dimensions, the certification process provides an opportunity for affirming shared values. * * *

"* * * * *

"Even as a theoretical matter, however, this (second) rationale for character screening remains problematic. While these professional interests help explain, they fail adequately to justify the bar's attachment to character screening. To prevent or deter individuals from entering a profession in order to promote the reputation, autonomy, or monopoly of existing members is troubling on constitu-

ORS 9.529 describes the nature of bar proceedings:

"Bar proceedings relating to discipline, admission and reinstatement are neither civil nor criminal in nature. They are sui generis and within the inherent power of the Supreme Court to control. The grounds for denying any applicant admission or reinstatement or for the discipline of attorneys set forth in this chapter are not intended to limit or alter the inherent power of the Supreme Court to deny any applicant admission or reinstatement to the bar or to discipline a member of the bar."

BR 5.1(a) provides:

"Trial panels may admit and give effect to evidence which possesses probative value commonly accepted by reasonably prudent persons in the conduct of their affairs. Incompetent, irrelevant, immaterial, and unduly repetitious evidence may, however, be excluded at any hearing conducted pursuant to these rules."

The wording of BR 5.1(a) is similar to ORS 183.450(1) relating to administrative proceedings and rules of state agencies.

Applicant objected to the hearsay nature of many of the exhibits. In each instance, the objection of applicant was overruled. All exhibits offered were admitted with the exception of a manuscript of a book about the bombing incident that was written by a South African author who specializes in writing about urban terrorists.

In deciding this case, we do not rely on any hearsay evidence. Our findings are based on current statements made by applicant that demonstrate he is not presently of good moral character.

## APPLICANT'S BACKGROUND

We take the following statements of facts from the findings of the trial panel. David Sylvan Fine was born in Wilmington, Delaware, on March 19, 1952, and was the second of two children born into a middle-class family. He

---

tional as well as public policy grounds. * * * [I]t is difficult to construe the bar's parochial concerns as the kind of legitimate state interest normally required to restrain vocational choice."

National Conference of Bar Examiners, The Bar Examiner 5, Vol 54, No 4 (Nov 1985), excerpted from Rhode, *Moral Character as a Professional Credential,* 94 Yale L J 491, 509, 512 (1985).

attended the Wilmington Friends School in Wilmington, Delaware, a private school run by the Quakers. At the age of 13 he became actively involved in activities to oppose the United States' participation in the Vietnam war. During his high school years, applicant adopted a pacifist belief and participated in anti-war activities with persons who were firmly committed to pacifist and non-violent views. Applicant's involvement in anti-war activities included demonstrations in Wilmington, Delaware, and Washington, D.C. The group to which applicant belonged was the Wilmington Anti-War Committee.

Applicant was admitted to the University of Wisconsin at Madison, Wisconsin, in the fall of 1969. Applicant chose the school because of the journalism program and because there was an active anti-war movement at the school. Applicant's grades in his freshman year were above average. His outside activities involved becoming a reporter on the university's daily newspaper, The Daily Cardinal. In the spring of 1970 he became a night editor for the paper. As a member of the editorial staff, applicant supported editorial opinions which condoned the use of violence. He wrote an editorial in or about April 1970 in The Daily Cardinal, entitled "By Any Means Necessary," which condoned various forms of violence by "revolutionaries," including kidnapping and murder.

## APPLICANT'S MISCONDUCT

During this time applicant became acquainted with a Leo Burt, another writer for The Daily Cardinal. In early August 1970, applicant was approached by Mr. Burt and asked to become a participant in the bombing of the United States Army Math Research Center (Math Center), which was located on the University of Wisconsin campus. On August 20 applicant agreed to become a participant. The other two persons involved in the conspiracy were Dwight Armstrong and Karleton Armstrong, whom applicant met after agreeing to participate in the bombing.

Applicant was an active participant in the planning of the bombing. He was aware of the size and nature of the bomb, its potential for doing great physical damage and for harming individuals, and that Karleton Armstrong had been

involved in previous bombings and was operating under the name of the "New Year's Gang."

In the early morning of August 24, 1970, Karleton Armstrong drove a stolen van to the Math Center. Another vehicle, which belonged to Karleton Armstrong's father, was brought to the Math Center for use in the escape. Applicant was several blocks away from the Math Center at a phone booth. He was to wait for a pre-arranged signal to call the police and advise them that a bomb was to go off. At 3:41 a.m., applicant called the Madison Police Department and made the following statement:

> "Okay, Pig, listen good. There is a bomb at the Army Math Research Center, University, and it is going up in five minutes. Get everyone out of there and clear the area, warn the hospital. I am not bull-shitting, get everyone out of there now."

One minute and forty-five seconds later, the bomb detonated, resulting in the death of Dr. Robert E. Fassnecht who was doing research in the building. The explosion caused approximately $2.5 million damage to the building and the destruction of records of many hours of research performed at the building. Several other persons were injured in the bombing. In addition to the direct damage to the Math Center, numerous other buildings sustained damage. The bomb had the explosive effect of 3,800 sticks of dynamite and, at the time, was classified as the largest home-made bomb in history.

Upon hearing the news reports of the death, the four conspirators decided to flee. Applicant obtained a car belonging to a friend, and the four, Karleton Armstrong, Dwight Armstrong, Leo Burt and David Fine, traveled to Ann Arbor, Michigan, and then to New York City where they split up. After the bombing, applicant participated in the writing of communiques in which he took full responsibility for the bombing and espoused the correctness of the action, attempting to justify it as a morally correct action against the United States Government.

Applicant and Leo Burt traveled to Boston and then to Ontario, Canada. Applicant and Mr. Burt then went separate ways and have not seen each other since. The whereabouts of Leo Burt were still unknown at the time of the Bar proceedings.

Applicant returned to the United States, traveling to various mid-western cities and eventually to California, where he spent the majority of his fugitive period. He obtained or created numerous documents to support false identities, including a Selective Service Registration Card, Social Security cards and a driver's license. At no time while a fugitive did applicant make any attempt to contact authorities to turn himself in.

Applicant wrote two articles during his fugitive period wherein he reiterated his full commitment to the revolutionary movement and fully accepted responsibility for, and agreement with, the bombing of the Math Center. One article was written in 1972; the other was written in 1975 on the fifth anniversary of the bombing. On January 7, 1976, applicant was arrested by FBI agents. He initially identified himself as a William Lewes and denied that he was David Sylvan Fine.

Applicant did, at all times from the planning of the bombing through his arrest, and up until the time of sentencing, acknowledge and state that his role in the bombing was equal to that of the others and that he was in full support of the reasons behind the bombing and the "correctness" of the action.

Applicant pled guilty on June 8, 1976, to two felony counts in federal district court: Conspiracy and unlawful flight to avoid prosecution. On the same day, applicant pled guilty in the Circuit Court of Dane County, Wisconsin, to charges of destruction of property and to Murder in the third degree for causing the death of Robert Fassnecht.

Applicant was sentenced to a total of seven years' incarceration on the federal charges and received a sentence in the state court of seven years, which ran concurrently with the federal sentence. Applicant spent a little over three years in prison and was paroled on August 15, 1979. He served a parole period of approximately three years and was released from that parole. His conduct during imprisonment and parole was exemplary.

## APPLICANT'S CONDUCT
## SINCE RELEASE FROM PRISON

Applicant enrolled at the University of Delaware and graduated with a Bachelor's degree in Political Science in

1981. During his senior year, applicant surveyed various states regarding bar admission requirements. In each case, applicant stated that his involvement in the bombing was of a "limited nature." He was accepted to five law schools. Applicant entered the University of Oregon School of Law in the fall of 1981. During the next three years he successfully completed his course of studies. He worked for the Public Defenders Services of Lane County, Inc., during his third year in law school and appeared in court on behalf of clients of that office.

Applicant graduated from the University of Oregon School of Law in June of 1984. He sat for the bar examination in July of 1984, achieving a passing score.

Except for details, the foregoing findings of the trial panel are essentially undisputed and we adopt them. The point of these findings is not that the past events necessarily disqualify applicant today but that they bear on his present candor, credibility and trustworthiness as a lawyer.

## APPLICANT'S CREDIBILITY

Applicant's testimony before the Board of Bar Examiners and on deposition was that he entered the conspiracy to bomb the Math Center and participate in the act itself without any reflection and that his decision resulted from his immaturity at age 18. On deposition taken June 4, 1985, in these bar proceedings, applicant testified that he was very concerned that the risk of injury to others be minimized and therefore a warning call would be given to the police at least 15 minutes before the explosion in order that the area could be cleared. Applicant testified that the bomb was to be the equivalent of approximately 3,800 sticks of dynamite and was intended to cause substantial damage rather than being merely symbolic. In regard to the warning time, on deposition applicant testified initially:

"Q. And how long was the fuse to be?

"A. I believe it was supposed to be 15 minutes, if I remember correctly.

"* * * * *

"Q. Why couldn't they park the car and just go down the street and make a phone call?

"A. Too long.

"Q. Why?

"A. They wanted a maximum amount of warning time.

"Q. That is your understanding of the plan?

"A. That is correct. They would have been three or four minutes after parking the van off 15, that is 11 minutes, and that is kind of a short period for there to be a warning.

"Q. Why would they have ----

"A. The closest phone was eight or ten blocks away. Fifteen minutes was already considered quite short, but sufficient. Thirteen minutes was two minutes less and that is getting towards the short side.

"Q. Did you inquire about that?

"MR. MARMADUKE: About what?

"MR. KILMER: About the time sequence and how important that was?

"THE WITNESS: Definitely.

"Q. (By Mr. Kilmer): Was that a subject of great concern to you?

"A. Yes.

"Q. To make sure there was plenty of time to get people out?

"A. Correct. That is one of the reasons I agreed to do what I did."

And then again:

"Q. Did you ever ask about how reliable the timing device on this bomb was going to be so that you knew there was going to be 15 minutes?

"A. I asked about that, yes.

"Q. What were you told?

"A. I was told by Karleton that he had tested it and he knew exactly what length of fuse produced what amount of time.

"Q. And you understood that that was 15 minutes?

"A. Yes."

Subsequently, in the same deposition, applicant was confronted with the message he had actually given to the police, which stated that there was only a five-minute warning. The question was then asked:

"Q. Now where did the five minutes come from?

"A.   That is what must have been determined at that point.

"Q.   We have talked in this deposition about 15 minutes. Five minutes is a lot shorter. Which was it?

"A.   Five minutes.

"Q.   Did you think five minutes was enough time for people to go in and get people out of there?

"A.   Yes, I do.

"Q.   Did you expect police to respond to that message?

"A.   Yes.

"Q.   What did you expect them to do? Did you expect at least somebody to come there?

"A.   Yes, but I expected them to clear the building.

"Q.   Did you expect them to come and clear the building and get away in five minutes before that bomb went?

"A.   Yes.

"Q.   Did you ever check how long it took to get from the Police Department to the Army Math Research Center?

"A.   No.

"Q.   Did you ever think about the fact that your five minutes window might not be enough time?

"A.   Yes.

"Q.   Did you ever check it out?

"A.   Check what out?

"Q.   Did you ever check out to see whether it was enough time or not?

"A.   I don't understand."

The trial panel found and we agree that had applicant not gone into some detail explaining the thought-process that went into determining the sufficiency of the 15-minute warning, this discrepancy might be attributed simply to errant memory. However, it cannot be so excused. The testimony about the 15-minute time interval was a deliberate effort by applicant to state the matter in a light most favorable to himself regardless of the facts. We observe that applicant changed his story only after being confronted with a prior inconsistent statement. This is classic impeachment of a witness's credibility and a crucial misstatement by the accused. These differences in timing are not nit-picking differences.

They represent the difference between life and death. In this case, if applicant had given 15 minutes' warning, Dr. Fassnecht might not have died in the explosion. In this conspiracy it was applicant's responsibility to give an adequate warning. Under oath he testified falsely about the warning time.

Before the Board of Bar Examiners applicant also testified falsely about his involvement in the bombing:

"Q. How long before that incident took place did you become involved?

"A. Four days.

"Q. Would you tell the Board how it came about that you were enlisted and why you were?

"A. Well, actually I had returned to Madison earlier than the start of school to go to a wedding of a Daily Cardinal staff member. And I went to his wedding. This is August 20th. I believe it was a Saturday. Actually it would have had to have been before that because the 24th was Sunday — Monday. Perhaps a week before. So I would have to amend what I said about four days. I believe it was actually closer to a week because it was definitely the previous weekend.

"Q. What were you approached to do and why were you approached as far as you know?

"A. I was approached to become involved in this incident which had already been basically ready to go, you might say. I was told that the explosive had been procured and the truck had been stolen, I guess at that point. It was really ready to go, you might say. The participants were concerned that they did not have enough manpower to do exactly what they wanted to do. There were a couple of minor things they wanted done they were logistically having problems doing with only three people and needed a fourth person.

"* * * * *

"Q. At the time you were asked to serve in those two roles what was your state of mind? How did you look upon it? Did you consider it over a period of time and then give an answer as to what you would do?

"A. I didn't consider it. I pretty much agreed immediately."

Similarly, when his deposition was taken on June 4, 1985, applicant testified:

"Q. Then how did you meet the Armstrongs?

"A. I was introduced to them by Leo Burt.

"Q. When?

"A. This would be about something like August 17, 1970.

"Q. You had never met them before that date?

"A. No, I had not.

"* * * * *

"Q. Now, when is the first time that you learned that there was something afoot to bomb a building?

"A. This is on this day, probably one day before the day where I just described meeting Karleton Armstrong. I had returned to Madison for a wedding. A friend was getting married just prior to his last year at Wisconsin. He was a good friend of mine, one of the Daily Cardinal people, and I was invited to his wedding. I returned to go to his wedding, and I believe it was something like August 16 was the exact day and I was at the wedding. It was at a synagogue in Madison and there was a party at his house on Spaight Street, where I actually had intended to live the following year.

"Q. This is a party at whose house?

"A. Elliott Silverberg, 947 Spaight Street, S-p-a-i-g-h-t, and at the party, I was approached by Leo Burt.

"Q. When is the last time you had seen Leo Burt before that?

"A. Probably right before the Ann Arbor Blues Festival when I went back to Pittsburgh and then to Ann Arbor to go to that, and that is probably the end of July, 1970, something like that.

"* * * * *

"Q. Now when you were first approached about this bombing, tell me as much as you remember about that.

"A. Basically, Leo Burt approached me at this party and said, let's go in the other room, I want to talk to you. I said okay and we went in the other room. He said, there is going to be a bombing, Army Math Research Center, and we need somebody else to be involved, and we would like to know if you are interested in being involved.

"* * * * *

"Q. Now going back to this whole deal in Mr. Silverberg's apartment at Spaight Street, Burt says exactly what to you?

"A. I don't know exactly what he said.

"Q.    As much as you can remember.

"A.    Something to the effect that there was going to be a bombing at the Army Math.

"Q.    Tell me the ensuing conversation up to the point that you said I am in.

"A.    I said, who is it, and he said, it is the New Year's gang.

"Q.    Go ahead.

"A.    Then he said, we need someone else to help, and I said okay. That is about as long as it took."

The trial panel noted that this testimony is contradicted by an affidavit executed by applicant on July 16, 1976, setting forth his version of his involvement in the bombing of the Math Center. The purpose of the affidavit was for possible impeachment of applicant in the event that he were required subsequently to testify in criminal trials against any of his co-conspirators. Contrary to the above-quoted testimony, the affidavit reveals that applicant was approached to join the conspiracy probably in the first week of August 1970 and that he did not agree to join the conspiracy until about August 21, 1970, after deliberating on the question.

The affidavit given in 1976 was materially inconsistent in several respects with his sworn testimony taken on June 4, 1985. We find that this inconsistency was not due to faulty memory, but was a deliberate falsification. At the time applicant entered his plea of guilty to the federal charges, he entered into an agreement with the United States Attorney in Wisconsin that the affidavit accompanying his plea would be sealed and would remain sealed pending capture of the other co-conspirators still at large. We infer that applicant did not anticipate that this prior statement would be revealed in these bar proceedings. He knew that one of the co-conspirators was still at large, and when first asked whether he had any objection to the document being unsealed for the limited purpose of being used in the bar proceeding he voiced an objection. Subsequently, after consultation with his counsel, and three days after this testimony, his counsel sought release of the document.

That after-the-fact action did not cure applicant's initial resistance to the production of this prior statement, which he knew contained his inconsistent statements.

Whether applicant spontaneously agreed to enter this conspiracy due to his immaturity or whether he only entered the conspiracy after giving it considerable thought and concern for the safety of others is not a matter likely to be forgotten. This episode was paramount in applicant's mind at the time of the hearing, and a person as bright as he would not forget how he became involved in such an event.

Nor, as we previously mentioned, would applicant likely forget the crucial time set for the bomb to go off. This 1976 affidavit (Exh 37) also demonstrates that applicant knew full well that the timing for the explosion was 5 minutes and not the 15 minutes he testified to in these proceedings. He gave this sworn statement in that document:

"The question of time was discussed at this point as to how much time there would be, a person said that there was six minutes of fuse. I said I thought that was, wasn't nearly enough fuse that they wouldn't have time to clear the building cuz really it would only be about four minutes, after they got away and the call was made, and they said no, it has to be, it can't be too long because P and S might come and see the burning fuse, and extinguish it, but it and that five minutes was definitely sufficient to clear the building. * * *"

The significance of this timing was etched in applicant's mind. He intentionally distorted the length of time for the explosion in order to minimize his prior actions.

Applicant's conduct after the bombing went far beyond the bombing itself and continued for years thereafter. After the bombing, applicant and his co-conspirators decided to flee to avoid prosecution. Applicant was instrumental in the success of the early stages of the flight in that it was he who obtained the vehicle by which the co-conspirators left Madison Wisconsin, went to Ann Arbor, Michigan, and on to New York City.

While in New York City applicant obtained or created documents evidencing false identities. After New York City, applicant and Leo Burt briefly visited applicant's sister in Boston, Massachusetts, and then proceeded to Canada. The evidence reveals that applicant slipped into the role of fugitive and, through continuous acts of deceit, successfully maintained that status for approximately five and one-half years until his arrest. In this course of time applicant created at

least two false identities and the documents to support them and was in the process of creating a third at the time of his arrest.

After the bombing, applicant had a choice to stop his criminal activity and turn himself in. He did not. He had just participated in an act that killed an innocent person and caused extraordinary damage. Instead of accepting responsibility for his wrongful conduct, he chose to protect himself by fleeing.

Applicant admitted that he had never given any serious thought to giving himself up. But for his arrest, applicant would have engaged in flight indefinitely. The bombing occurred in August of 1970, but applicant was committing the felony of unlawful flight to avoid prosecution as late as January 1976, and probably would have continued to do so had he not been caught. There is nothing in the newspaper articles he wrote to suggest that the applicant viewed himself as anything other than a full partner in the bombing of the Math Center and a continuing advocate of the views which led to the bombing.

Applicant's complete devotion to his self-interest at the sacrifice of others is demonstrated by his total lack of communication with his parents during the five and one-half years that he was a fugitive. The parents did not receive one word from him for the entire period. They did not receive inquiry from him as to their health or their needs for five and one-half years. His own testimony was that this was a very close-knit family and remained so. In fact, applicant's parents mortgaged the family home to raise money for his bail after he was captured.

Applicant's political views and opposition to the government's actions in Vietnam and Cambodia have no bearing on his present fitness to practice law. Several respected persons testified favorably about the character of the accused based on their association with him. However, none had personal knowledge of the facts of the case, of his years as a fugitive or of his inconsistent statements made during these bar admission proceedings. Contrary to the conclusions of those who only recently have become acquainted with applicant, we find from our *de novo* review of the entire record of this case that applicant has changed only when he has been

made to change or when it has been to his advantage to do so. His important decisions relating to his acts and attitudes are not based upon what is right or wrong, but only on what is expedient or good for him. He not only engaged in a heinous crime in the past but continues to misstate the facts of the crime and his involvement in it in order to gain admission to the bar.

Like the members of the trial panel who saw and heard him testify, we are not convinced of applicant's candor. He has not shown himself to be a credible person and did not establish that he now has the good moral character required to practice law. We base our decision on applicant's present statements about his past acts. We recognize that persons can and do reform. However, in this case applicant's deceitful, self-serving conduct persisted at the time of the hearing.

Admission to the Oregon State Bar is denied. Costs awarded to the Oregon State Bar.