Argued and submitted May 5, admission to the Oregon State Bar denied August 20, reconsideration denied November 24, 1992

In the Matter of the Application of

Robert Roosevelt PARKER, Jr.,

for Admission to the
Practice of Law in Oregon.

(SC S38473)

838 P2d 54

Leland R. Berger, of Rieke, Geil & Savage, P.C., Portland, argued the cause and filed the brief for the applicant. With him on the brief were Forrest N. Rieke and Clary A. Hanmer, Certified Law Student, Portland.

Jeffrey D. Sapiro, Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

█    The Board of Bar Examiners (Board) recommends denial of applicant's request to be admitted to the practice of law in Oregon. Applicant seeks admission notwithstanding the Board's action. The case is before us for *de novo* review, ORS 9.536(3), ORS 9.539, and BR 10.6. The issue on review is whether applicant showed that he possesses the statutory qualifications required for admission to practice law. ORS 9.220(2) in part provides that an applicant must show that the applicant:

"(a)   Is a person of good moral character and fit to practice law.

"(b)   For purposes of this section * * *, the lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation. The conduct or acts in question should be rationally connected to the applicant's fitness to practice law."[1]

After hearing, the Board found multiple reasons for not recommending the applicant for admission. One finding was that during a telephonic interview concerning a credit card application with SeaFirst Bank, applicant either impersonated his employer or was complicit with such an impersonation by a third person. The fact that such an impersonation occurred is not presently disputed. However, there was conflicting testimony about who did the impersonation and when.[2]

Applicant's co-worker testified:

"Q.   Miss Thomas, was there ever an instance where you saw Mr. Parker impersonate State Senator Jim Hill?

"A.   Yes, I did.

---

[1] Rules Regulating Admission 12.10(6) (formerly numbered 7.5) provides in part: "[A]n Applicant must establish by clear and convincing evidence that she or he has the requisite character and fitness to practice law."

[2] Because disposition of the case is made on the impersonation issue, we do not reach other issues presented by charges of being in arrears in child support payments, intentionally incurring indebtedness without any ability to repay it, and dissimulation during a deposition about whether it was applicant's signature that appeared on certain documents evidencing debt.

"Q. Can you tell us when that happened as best you can recall.

"* * * * *

"A. He was standing up behind his desk and he had the phone in his left hand and he said 'This is' — 'Yes, this is Senator Hill.'

"Q. Are you firm in your recollection that that's what he had to say?

"A. Absolutely. No question about it.

"Q. Was there anybody else in that room?

"A. No, there was not.

"Q. What did you do at that point?

"A. I turned around and I walked — I walked back out and I went back to my desk and waited until he got off the phone and I went back in.

"* * * * *

"Q. And what did you say to him at that point?

"A. I asked him why he would do something like that.

"Q. Did Mr. Parker respond to your question?

"A. Yes, he did.

"Q. What did he say?

"A. He said 'you don't tell anybody about that. * * *' "

Renato Bermudez, who telephoned for SeaFirst Bank seeking employment information about applicant, testified as follows:

"Q. And did the person who answered the phone identify himself at that point?

"A. No, not yet.

"Q. Could you distinguish was it a male or female voice that answered the phone?

"A. It was a male.

"* * * * *

"Q. Did you then ask the caller, the person that you called, to identify himself?

"A. Yes, sir, before we hang up we normally needed to get the name of the person that we were speaking to.

"Q. And to whom were you told you were speaking?

"A.  Jim Hill.

"Q.  And did that person identify the title for Jim Hill?

"A.  I was kind of surprised, too, because he said he was the state senator."

Next, we set out applicant's testimony. Applicant indicated that there were two separate conversations involved (one in mid-February and one in mid-March) and that the co-worker misunderstood the conversation that she overheard.

Concerning the overheard conversation, applicant's testimony was as follows:

"A.  I'm familiar with Mrs. Thomas's testimony on that issue.

"* * * * *

"Q.  Can you tell me did she ever witness a telephone conversation in which you said anything to that effect?

"A.  She witnessed a conversation where she heard me say 'Jim Hill' but it wasn't that she heard me say I was Jim Hill. *Someone called and said who was the chair of the committee, I said 'that would be Senator Hill.' She walked in the door as 'Jim Hill' was coming out of my mouth.* [Emphasis added.]

"Q.  Do you know who that person was that called in?

"A.  No, just a general inquiry. I feel [sic fielded?] that a number of those type of calls and I have told numerous people that Jim Hill was the chair of the committee.

"* * * * *

"Q.  Did you ever have a conversation with Senator Hill in which he informed you that Kathy Thomas had alleged that you had impersonated him on the telephone?

"A.  Yes, sir.

"Q.  And can you tell us what you recall of that conversation?

"A.  He asked me what happened and I told him.

"Q.  But at that time, Mr. Parker, did you tell him that it was someone else?

"A.  That was not the conversation of which she had made reference to.

"Q.  So the conversation you think he questioned you about was the one in which you simply informed somebody who the chair of the committee was, Jim Hill?

"A.  Right.

"* * * * *

"Q. What do you recall that you replied to Senator Hill when he approached you with Kathy Thomas's question?

"A. I told him that Kathy was out of line, that I didn't impersonate him.

"Q. *And did you explain what you had said?*

"A. *Basically that I told whoever had called that he was the chair of the committee.*" (Emphasis added.)

Concerning what applicant says was a separate conversation with Mr. Bermudez, the SeaFirst Bank's credit card authorizer, applicant testified:

"Q. Senator Hill also said that when he was talking to you fairly recently or in the early part of '91 or late '90 and you told him about this other person, he said the way you described the incident was that the other person just took the phone and said 'This is Senator Hill.' Do you recall telling that to Senator Hill?

"A. No, I don't recall telling him. Maybe that's his characterization, okay. But I told Jim what I just disclosed to you all with the exception that I disclosed who it was.

"* * * * *

"Q. * * * Did you ever in the context of a credit application represent to someone on the telephone that you were state Senator Jim Hill?

"A. No, sir, I did not.

"* * * * *

"Q. Did you ever have a conversation with Senator Hill about the call from SeaFirst?

"A. Yes.

"Q. When was that?

"A. *He asked me about the SeaFirst situation* when it came out *in the investigation in May of '87 and I told him that I did not impersonate him.*

"Q. At that point did you tell him that someone else had?

"A. No, I did not.

"Q. Why not?

"A. I limited the conversation to the question, okay. The person that was involved I gave my word in May of '87 that I would not bring him or his family into it. The person still works in the legislative assembly in a very visible position

and I think it would perhaps be inappropriate to drag him into it now. I gave him my word that I wouldn't and I haven't.

"* * * * *

"And from my perspective if I say it was John and John says it wasn't me, then we have another screaming match whether it was John or whether it was me. And I have been through too much screaming matches with people. I'm not — I just don't see it being in my benefit to scream anymore." (Emphasis added.)

Senator Hill testified before the Board twice concerning those conversations with applicant. On the first occasion, he testified in part:

"Q.   Senator Hill, were you ever told by anyone that Mr. Parker was impersonating you on the telephone?

"A.   Yes. The committee, the committee assistant. * * * had told me she walked into the office, said she heard him telling somebody that he was me. And I confronted him with it *and what he told me was something to the effect that what he was saying in answer to a question was that he worked for Senator Jim Hill and that's why he used my name*, but I just did not know who to call to verify it one way or the other.

"And so basically at that point it was kind of I guess her word against his and I asked him to give me an explanation, which is he said that he was — did not say that he was me. *He said on the phone someone asked him who his — who his boss or who his employer was and he said 'Senator Jim Hill'.*" (Emphasis added.)

In Senator Hill's second round of testimony, the following transpired:

"Q.   Did Mr. Parker ever tell you that he had witnessed someone else impersonate you in a telephone conversation?

"A.   Yes, he did.

"Q.   And was that — tell me when that occurred. Was that about before or after Kathy Thomas came to you and said that she had seen Bob Parker do this?

"A.   This was really long after that. I mean this was really not too long. I'm thinking probably some months ago, a few months ago.

"Q.   Sometime in 1990 we are talking about?

"A.   I think it was probably 1990, yes.

"Q.  So during the time that you were conducting your investigation, for lack of a better word, this never came up?

"A.  No, it never came up.

"Q.  *He simply denied that he impersonated you on the telephone?*

"A.  *That's right.*

"* * * * *

"Q.  What were the circumstances when Mr. Parker came to you several months ago to tell you that he had witnessed someone else impersonate him?

"A.  Impersonate —

"Q.  I'm sorry, impersonate you. Thank you.

"A.  Well, I had told him all along, and I said the most damaging thing that I thought to me would appear to be the most damaging was this impersonation issue. And I said I didn't know, because I then had found out about the stuff, the SeaFirst Bank and all that.

    "And I said, to me, even from an out — looking objectively from the outside, I said that's the only thing that I see here that is — that will be troubling for you. * * *

"Q.  And it was after you told him that you thought this was one of the most damaging allegations against him?

"A.  It was well after that. I mean we are talking about I'm sure it was less than a year ago so we are talking a year."

    The foregoing testimony supports several comments bearing on applicant's credibility. First, what applicant told his employer about the conversation overheard by his co-worker is not consistent with what he told the Board under oath. He told the Board that the question that the co-worker heard him answer was, "who is the chairman of the committee?" He said the co-worker overheard him answer that the chairman was Jim Hill, Senator Hill. But he told Senator Hill that the question was one of who his boss was or for whom did he work. Senator Hill's testimony on this point was quite exact. He testified on repeated occasions that applicant told him that the question to which the answer overheard by the co-worker related was one of who employed Mr. Parker, not who was the chair of a committee.

Second, it is clear that the applicant failed to tell Senator Hill for over three years that anyone else impersonated the Senator while in the committee office answering telephone questions concerning extension of credit to an employee of the legislature. His first omission was when Senator Hill himself conducted an investigation in 1987. Other government agencies also investigated. Applicant denied that he had impersonated Senator Hill. Applicant never disclosed anything about any third-party impersonation until some time in 1990, after Senator Hill advised applicant that this impersonation was the most damaging allegation against him, in the Senator's opinion. By applicant's own admission, he kept the fact of this potentially unlawful conduct a secret even though the subject of impersonating Senator Hill had been inquired about officially and repeatedly. When coupled with the denial of impersonation, this omission amounted to a misstatement of fact.

Applicant still keeps part of the information related to his version of an impersonation of his supervisor a secret, offering two explanations: first, that he is honor-bound to keep it a secret and, second, that if he did disclose who did the impersonating to obtain a credit card for applicant the impersonator would deny having done it, leading to another " 'tis so,'" " 'tis not" controversy. Neither explanation is consistent with the remainder of applicant's conduct concerning those whose interests have become adverse to his own. If honor's dictates are injected in the situation, it would appear that an equally strong command of loyalty to Senator Hill and the legislature would require disclosure that one long-time legislative employee was willing to and did impersonate a member in a telephone conversation having as its object to obtain credit from a financial institution.

We reject applicant's argument that the evidence associating him with an impersonation rises no further than a "mere suspicion." In addition, we find that the testimony of Ms. Thomas is credible and that the impersonating conversation that she recounts took place. It follows that applicant cannot prevail on this point, because it was his burden to convince us that the conversation did *not* occur as she recounted it.

When statutes regulating the practice of law and the admission by this court of persons to that practice were adopted in 1862, possession of good moral character was one requirement for admission, Deady Civil Code of 1862, § 1003; and conviction of a misdemeanor or felony involving moral turpitude was "conclusive" evidence justifying either removal or suspension by the Supreme Court after admission to practice, *id.* at § 1015. The moral turpitude standard for negating "good moral character" has since been enacted in the admission statute. ORS 9.220(2)(b) provides that:

> "the lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial doubts about the individual's honesty * * *."

A criminal prosecution or conviction is not a condition precedent to a decision to disqualify a person from the practice of law based on that person's dishonest conduct. Dishonesty demonstrating moral turpitude may be shown without a specific reference to a criminal law that might have been violated. However, the enactment of a criminal law on the subject, proscribing and punishing certain dishonest conduct, may establish that conduct of that character is of a sufficient nature and gravity to disqualify one from practice.[3] There is a statute dealing with impersonation of a "public servant" in Oregon. ORS 162.365 provides:

> "(1)  A person commits the crime of criminal impersonation if with intent to obtain a benefit or to injure or defraud another the person falsely impersonates a public servant and does an act in such assumed character.
>
> "(2)  Criminal impersonation is a Class A misdemeanor."

Definitions for ORS 162.365 are found in ORS 162.005, which provides in part:

> "(1)  'Pecuniary benefit' means gain or advantage to the beneficiary or to a third person pursuant to the desire or

---

[3] The Oregon admission statute, ORS 9.220(2), requires, of course, that the disqualifying conduct "should be rationally connected to the applicant's fitness to practice law," thereby covering the same ground as did the Supreme Court of the United States in *Schware v. Board of Bar Examiners*, 353 US 232, 239, 77 S Ct 752, 1 L Ed 2d 796 (1957).

consent of the beneficiary, in the form of money, property, commercial interests or economic gain * * *.

"(2)  'Public servant' includes:

"(a)  A public officer *or employee of the state* or of any political subdivision thereof or of any governmental instrumentality within the state[.]" (Emphasis added.)

There are no completely analogous impersonation cases on which to rely.[4] However, impersonation of another to obtain some economic gain has resulted in severe outcomes in a number of cases, including the following: *In re Chambers*, 292 Or 670, 680-81, 642 P2d 286 (1982) (the accused suspended for two years for impersonating an insurance agent); *In re William Vann Cheek*, 246 Or 433, 425 P2d 763 (1967) (the applicant denied admission because he signed name of president of company to two checks and lied about damages to a company automobile).

There are also some cases from other states denying admission for impersonations more directly related to the examination process. In *In re Portnow*, 253 App Div 395, 2 NYS2d 553, 554 (1938), the applicant took the bar examination "by impersonating the Portnow who was graduated at [Columbia Law]." He told the other Portnow about it. "[A]pplicant had admitted to him that he was endeavoring to impersonate him for the purpose of obtaining admittance to the Bar" *Id.* at 555. In *In re Knight*, 232 Ga 721, 208 SE2d 820, 821 (1974), "the applicant freely admitted that he had contacted two out-of-state law students by telephone, then made a trip out of state and offered them $5,000 if they would successfully take the examination for him."

In *State ex rel v. McMenamin*, 146 Or 60, 65, 29 P2d 520 (1934), the court quoted the rule that conduct of the sort that would justify disbarment would also prevent admission to the bar, stating:

"Such conduct as defendant was guilty of would certainly prevent his admission to the bar of this state if consummated

---

[4] *See* Annot, *Admission to Bar — Moral Character*, 64 ALR2d 30 (1957), and Annot, *Falsehoods, Misrepresentations, Impersonations, and Other Irresponsible Conduct as Bearing on Requisite Good Moral Character for Admission to Bar*, 30 ALR4th 1020 (1984).

prior to the time of the application. Section 31-501, Oregon Code 1930, provides that:

" 'Any member of the bar of this state shall be disbarred by the supreme court, upon proper proceedings for that purpose, whenever it shall appear to that court that his conduct has been such that if he were then applying for admission to the bar his application should be denied.'

" ' "Membership in the bar is a privilege burdened with conditions." Matter of Rouss, [221 N.Y. 81, 84, 116 NE 782 (1917)]. The appellant was received into that ancient fellowship for something more than private gain.' People v. Culkin, 248 N.Y 265 (162 N.E. 487)."

Having said that, the court disbarred McMenamin for dishonesty in borrowing money from a client. The dishonesty consisted of offering security that was inadequate but without disclosing the defects to the lending client, and keeping part of the money himself while causing the client, a widow, to believe that she was loaning all of it to a third party. No criminal prosecution was brought, but the *McMenamin* court did not require prosecution or conviction to support the disbarment. We agree that neither prosecution nor conviction is necessary to permit consideration of dishonest conduct of a person applying for admission.

■     This court has decided other cases involving moral turpitude. A person who continues to misstate facts about prior dishonest conduct that could constitute a crime and about his involvement in it, in order to gain admission to practice law, does not show himself to be a credible person and does not establish that he has good moral character required to practice law. *In re Fine*, 303 Or 314, 736 P2d 183 (1987); *see also In re Easton*, 298 Or 365, 372, 692 P2d 592 (1984) (court noted that intentional conduct "to avoid a child support obligation" in a higher monthly amount was of concern when reviewing application for admission to practice); *In re Taylor*, 293 Or 285, 647 P2d 462 (1982) (admission denied based on perjury, theft, bankruptcy to avoid debt, and lack of reformation, quoting *In re Ruffalo*, 390 US 544, 555, 88 S Ct 1222, 1228, 20 L Ed 2d 117, 125 (1968) (White, J., concurring)). The admission statute requires that, to disqualify an applicant, conduct "should be rationally connected to the applicant's fitness to practice law." ORS 9.220(2). Lawyers must be

honest. Truth-speaking is requisite in this profession. Applicant's dishonest conduct is related to the question of fitness to practice.

■        Applicant claims that rehabilitation has occurred after the time of any past disqualifying conduct. We do not find rehabilitation established where, as here, applicant continues to testify under oath in a manner that is contrary to the facts. *See In re Jaffee*, 311 Or 159, 806 P2d 685 (1991) (where the applicant had committed criminal acts related to marijuana, applicant would not be permitted to apply for admission until the passage of the same period of time as would have been the period of suspension for a lawyer in practice committing the same acts).

Admission to the Oregon State Bar denied.