Submitted on record and briefs September 23, 1993, applicant admitted to the practice of law in the State of Oregon June 16, 1994

In the Matter of the Application of

Kenneth Miles JAFFEE,
*Applicant,*

for Admission to the Bar of
the State of Oregon.

(SC S35948)

874 P2d 1299

Kenneth Miles Jaffee, Medford, filed the briefs *pro se*.

Jeffrey D. Sapiro, Oregon State Bar, Lake Oswego, filed the brief for the Board of Bar Examiners.

Before Carson, Chief Justice, and Peterson,* Gillette, Van Hoomissen, Fadeley, Unis, and Graber, Justices.

PER CURIAM

Van Hoomissen, J., dissented and filed an opinion in which Unis, J., joined.

---

* Peterson, J., retired on December 31, 1993.

**PER CURIAM**

This is a contested bar admission case in which the issue is whether applicant Kenneth Miles Jaffee (applicant) should be admitted to the Oregon State Bar (Bar). We admit applicant to practice.

Applicant is a graduate of the McGeorge School of Law, an attorney admitted to the practice of law in California, and has passed the necessary examinations for admission to practice in Oregon. The question of his admission to practice in Oregon has been before this court once before. In *In re Jaffee*, 311 Or 159, 164-65, 806 P2d 685 (1991), this court denied applicant admission to the Bar on the ground that five years had not yet elapsed since applicant had committed acts that, had they been committed by an active member of the Bar, likely would have led to that person's disbarment. More than five years have now passed, and applicant has reapplied for admission. Although the then-members of the Oregon Board of Bar Examiners (the Board) recommended applicant's admission when the case previously was before this court, the present Board, by a split vote, has recommended that applicant not be admitted.

Because it serves as an excellent predicate for our discussion of the issues in the present case, we quote at length from the statement of procedural and factual history in our former opinion:

> "Applicant passed the Oregon State Bar examination in July 1988 and had earlier passed the Multistate Professional Responsibility Examination. After a hearing in November 1988, the Oregon Board of Bar Examiners, by a split vote, did not recommend his admission. Applicant did not seek review of that decision in this court.

> "[Applicant] reapplied in 1990. On August 28, 1990, after another hearing, the Board recommended his admission by a vote of ten to two. We initially denied his admission by an order dated September 18, 1990, without receiving written or oral arguments. Thereafter, applicant petitioned for reconsideration before this court. * * * [This court thereafter] provided the same review as [it] would have if applicant had appealed an adverse recommendation by the Board. * * *

> "* * * * *

"From 1975 to late 1982, applicant practiced law in Sacramento, California, in the field of criminal defense. In July 1986, he was suspended from practice for one year and placed on probation for one year, for neglect of client matters and unprofessional conduct, which had occurred in 1981 and 1982. Also while practicing in California, applicant served two days in jail for contempt, relating to his presentation of the defense in a criminal jury trial, and was, on another occasion, fined $50.

"Applicant's wife, who also was his sole employee, was murdered in September 1982. The crime has not been solved, but applicant believes that a former client was responsible. Following his wife's death, applicant moved to a rural area in southern Oregon. From late 1982 to late 1985, he was not employed; he used marijuana almost daily.

"In August 1985, law enforcement officers raided applicant's property pursuant to a search warrant. They found 143 marijuana plants, ranging in size from tiny seedlings to tall plants, in a garden plot and window box. Also found were scales, a needle kit, books concerning drugs, a few small plastic bags of dried marijuana, and numerous firearms. In December 1985, applicant was convicted of manufacture of a controlled substance, ORS 475.992(1)(a), a Class A felony. He had no prior criminal record, and no additional charges were brought as a result of the 1985 incident.

"Applicant was sentenced to community service and probation. He performed the community service at the Center for Non-Profit Legal Services, Inc., as a legal assistant. In July 1986, his probation was revoked for a threat of violence and for possession of firearms. He was sentenced to six months in jail and further probation. Applicant served the six months in jail. In March 1988, the circuit court granted an early termination of the extended probation.

"After applicant disclosed the conviction to the California State Bar, it instituted a disciplinary proceeding. Applicant agreed to all pertinent facts and cooperated in the disciplinary process. He stipulated to a six-month suspension from practice followed by two and one-half years of monitored probation. The California Supreme Court accepted the stipulation by order dated April 29, 1989. Applicant served the six-month suspension without incident and has complied with all aspects of the monitored probation, including quarterly reporting. If the probation is not violated, it will end on April 30, 1992.

"Applicant testified that he has not used drugs since the revocation of his probation in 1986. He described his incarceration as a turning point. After serving the jail sentence, in early 1987 he again became employed at the same legal services office as a legal assistant. At the time of the hearing, applicant remained in that position. His supervisor testified that applicant was committed to the legal services program and that he would be hired as a staff attorney there, if admitted. That also was applicant's desire. His supervisor and coworkers praised applicant's legal skills and rehabilitation and gave their unqualified recommendation for his admission.

"In addition, applicant became active in a nonprofit drug and alcohol rehabilitation and counseling program that serves the Jackson County area, and became president of the organization's board of directors. The executive director of the program, a clinical psychologist, recommended applicant's admission without qualification. She praised his work with clients [of that program] and his leadership on the program's board. In her professional opinion, applicant's antisocial behavior after his wife's death, from 1982 to the incarceration in 1986, was an aberration that he would not repeat in the future."

*Id.* at 161-63 (footnote omitted).

Testimony at the hearing on applicant's most recent application for admission did not materially alter our understanding of any of the facts surrounding applicant's history. It does appear from the most recent record that applicant's public service activities have continued and, if anything, expanded. Applicant also has been able to resume close ties with his parents — a connection that was of some assistance both to applicant and his father during applicant's mother's long illness and death due to cancer. The parents had moved to the Medford area to be near applicant; applicant's father continues to reside there. As will appear, the Board does not seem to challenge applicant's general reformation or his good works. Its concern — to the extent that it has one — focuses on applicant's 1985 and 1986 behavior and, more specifically, on what applicant now says about that behavior.

■ An applicant for admission to the Bar must show that he or she is a person of good moral character. ORS

9.220(2)(a).[1] An applicant must prove that he has the requisite character by clear and convincing evidence. *In re Rowell,* 305 Or 584, 588, 754 P2d 905 (1988). That means that an applicant must show that it is "highly probable" that he has good moral character. *In re Monaco,* 317 Or 366, 370 n 4, 856 P2d 311 (1993). Any significant doubts about an applicant's character should be resolved in favor of protecting the public by denying admission to the applicant. *In re Easton,* 298 Or 365, 367-68, 692 P2d 592 (1984) (citing *In re Alpert,* 269 Or 508, 518, 525 P2d 1042 (1974)), *cert den* 472 US 1012 (1985).

■ Applicant acknowledges that his prior misconduct shows that, at the time of that misconduct, he lacked the good moral character and fitness to be admitted to the practice of law in Oregon. The crucial inquiry is whether, following that time, applicant has reformed sufficiently to warrant his admission to the Bar. *In re Rowell, supra,* 305 Or at 588. This court spoke to the burden that this inquiry places on applicant when it said, in the course of its first opinion, that

> "applicant may reapply for admission after July 23, 1991. Applicant thereafter must (as an applicant for reinstatement [after disbarment] would have to do) establish by clear and convincing evidence that he is rehabilitated and presently possesses the necessary good moral character for admission * * *."

*In re Jaffee, supra,* 311 Or at 165.

■ As the Board acknowledges, "[r]eformation is a very difficult matter for a petitioner to prove and for [this court] to judge." *In re Bernard Jolles,* 235 Or 262, 275, 383 P2d 388 (1963). But reformation *can* be proved to this court's satisfaction, as this court's past decisions attest. *See, e.g., In re*

---

[1] ORS 9.220 provides in part:

"An applicant for admission as attorney must apply to the Supreme Court and show that the applicant:

"* * * * *

"(2)(a) Is a person of good moral character and fit to practice law.

"(b) For purposes of this section * * *, the lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation. The conduct or acts in question should be rationally connected to the applicant's fitness to practice law."

*Rowell, supra* (illustrating proposition). As evidence of reformation, this court has looked to (1) character testimony from those who know and have had an opportunity to observe the applicant, *In re Bernard Jolles, supra*, 235 Or at 275-76; (2) participation in activities that benefit society, *In re Rowell, supra*, 305 Or at 591; and (3) an applicant's forthright acknowledgment of the wrongfulness of his or her past actions, *In re Fine*, 303 Or 314, 736 P2d 183 (1987).

■ The record in the present case is replete with examples of all three of the foregoing types of evidence of reformation. Coworkers who have known and worked with applicant for years attest to his good character and dedication to his work and to the clients whom he serves. Supervisors echo those sentiments. Applicant's continuing and effective work on behalf of the disadvantaged and afflicted, including chemically dependent persons and persons afflicted with AIDS, is described by several people. And applicant not only acknowledges the wrongfulness of his acts, but points out that he has always been forthcoming concerning them. Detailing all the foregoing evidence would not serve any useful purpose. It is sufficient to say that it more than satisfies the demanding burden of proof of good character that applicant assumes in applying for admission to the Bar.

A majority of the Board was not so sure, however. While accepting the evidence of reformation and good works, the Board majority was not entirely persuaded that applicant was being completely forthcoming about his criminal activity. The majority relied on two circumstances: A technical linguistic dispute between applicant and the Board majority over the terms of the probation that he was serving for the drug charge, and the significance of the amount of marijuana that applicant was cultivating at the time of his arrest. We shall discuss each of those topics briefly.

Applicant's criminal probation was revoked, in part, because he possessed firearms, something prohibited of convicted felons. Applicant has always conceded that revocation of his probation for gun possession was warranted, because it demonstrated that he was not conducting himself as a law-abiding citizen while on probation. Applicant has always insisted, however, that the specific terms of probation imposed in his case did not mention gun possession. This is

both an accurate and an incomplete statement. The probation order itself did not mention firearm possession. The order did incorporate by reference the standard written conditions of supervision imposed by the Oregon State Corrections Division, however, and those conditions include a prohibition on possession of firearms.

The Board majority labels applicant's position on this topic as a "misleading * * * attempt[] to minimize or discount the cause of the probation revocation." We disagree. Applicant has been entirely forthcoming as to what happened and why it happened. There has been no minimization. Applicant repeatedly has described the events that led to his probation revocation and has acknowledged the justification for that revocation. No more was required of him.

Perhaps the more important of the Board's differences with applicant centers on applicant's drug offense. The objective facts are that applicant was found to be growing 143 marijuana plants, ranging from several that were five or six feet tall to many that were quite small seedlings. All were in or just adjacent to applicant's house. Applicant readily admitted growing the plants; the dispute is over his purpose in growing them.

Applicant contends that he began by growing plants in order to have a personal supply of marijuana. (He had been using marijuana heavily since his wife's death.) However, the total number of plants, if grown to maturity, would have exceeded by far any personal use needs of applicant and his housemate. Applicant acknowledges this. He contends that he simply got carried away with the process of growing the plants. For its part, the Board theorizes that applicant in fact had embarked on a commercial marijuana growing operation.

Applicant admits that he thought about the fact that, if all of the plants grew to maturity, he would have enough marijuana to sell, but he denies ever intending to sell any of it. As the Board summarizes its position,

> "While Applicant's statements are not diametrically opposed to one another, it is difficult to square a contention that the marijuana was solely for personal consumption with a concession, made later when pressed, that marijuana sales were considered. The [Board] is left to conclude that the

Applicant's assertion regarding personal consumption was not accurate or completely candid."

Again, we disagree. The picture that emerges to us from the transcripts is that of a man who was then clinically depressed[2] and who, with no financial pressures and no motivation to work at anything constructive, began growing marijuana plants for his own use and became intrigued with the process. What law enforcement authorities discovered was not an organized "growing" operation. Instead, plants in various stages of maturation (the vast majority of them quite small) were located in different places in and around the house. It was August, yet there was no irrigation system or any system designed to provide sufficient light to enable the seedlings to mature into the fall and early winter.

It is no surprise that a person of the applicant's intelligence and background as a criminal defense lawyer would recognize that, were all of the plants to mature, they would produce enough cured marijuana to sell. Indeed, it would have been far harder to believe applicant had he testified that he did *not* think of the possibility of selling some of the contraband substance. But awareness is not design or intent, and we are satisfied that applicant did not proceed beyond the awareness stage. We also note, in this regard, that applicant asserts — and there is no evidence to the contrary — that he did not even have a range of acquaintances in Oregon to whom he could have sold his crop. His reclusive lifestyle was utterly at odds with any scheme to become a major marijuana vendor; it was completely consistent with applicant's own explanation of his activities. We do not find a conflict between applicant's consistently told story and the physical facts.

Two particular points support our conclusion that applicant is not now the same sort of person who was convicted of a felony and later had his probation revoked: A psychologist who works constantly with applicant in a non-profit agency is so persuaded of applicant's reformation that she has openly encouraged applicant's involvement in several

---

[2] A clinical psychologist testified at one of the hearings that, in her opinion, applicant suffered during the pertinent period from post-traumatic stress syndrome.

highly visible acts of public service with which the psychologist also is associated. In so doing, she puts the credibility of her own nonprofit agency "on the line." We find that to be a strong endorsement. We also note that, after his probation was revoked, and after he had served time in jail, applicant's probation was extended. Later, however, that probation extension was dropped, and applicant was discharged from probation. Those decisions were made by a veteran trial judge, one whose eyes are very resistant to having wool pulled over them. We find this shortening of applicant's probation by a person who knows applicant better than we to be a further indication that applicant truly has reformed.

Like the responsible authorities in the State of California, which presently recognizes applicant as qualified to practice in that state, we now are satisfied from the record in this case that it is highly probable that applicant possesses the necessary character to justify his admission to the Bar. The fact that applicant possesses the other necessary qualifications for admission is not contested, and we find that those qualifications are present.

We agree that reasonable persons — as the dissenters clearly are — could reach a different conclusion than do we. Indeed, given the history of split votes by the Board concerning the issue before us, it perhaps would have been more remarkable had we been unanimous. We note here only that, having considered all that the dissenters — both by their written opinion and in extensive discussions — have urged us to consider, we are satisfied that applicant is *now* fit to practice law in Oregon.

Neither do we mean to suggest that the present Board majority (or previous Board members who were concerned during earlier versions of this case) is being irrational in its concerns. Some lingering doubt on the subject is reasonable. But applicant's burden is to establish that certain facts are "highly probable"; it is not to establish those facts beyond any reasonable doubt.

This case has been on a yo-yo before the Board. The first time that body considered applicant's request for admission, it recommended (by a divided vote) that admission be denied. The second time that it considered the matter, it

recommended (by a divided vote) that applicant be admitted. In this, the third application process, it again recommends denial (by a divided vote). On three tries, the votes stand at 19 for admission, 21 opposed.[3] None of the three votes appears to have been based on personal observations by Board members of the manner in which applicant testified. Compare *In re Fine, supra* (in which personal observations of the manner in which the applicant testified played a role). We simply are left to the record. From that record, a majority of this court now concludes that applicant, as he stands before us today, is qualified for admission.

Applicant is admitted to the practice of law in the State of Oregon.

**VAN HOOMISSEN, J.,** dissenting.

This proceeding (*Jaffee III*) involves applicant's third application for admission to practice law in Oregon. The Board of Bar Examiners (Board) recommended against his admission in 1988 and he did not seek review by this court (*Jaffee I*). His second application was denied in 1991 on procedural grounds. *In re Jaffee*, 311 Or 159, 806 P2d 685 (1991) (*Jaffee II*).

In this proceeding, the hearing panel recommended to the Board that applicant's application be denied. On review, the Board recommends to this court that his application be denied. Applicant petitioned for review of the Board's recommendation. The issue is whether applicant has established by clear and convincing evidence that he possesses the requisite good moral character and general fitness to practice law in Oregon. On *de novo* review, and viewing the evidence from 1975 to the present as a whole, I would deny admission.

## FACTS

The record in this proceeding incorporates the records from *Jaffee I* and *II*. Because my vote to deny admission is based primarily on the factual record in this proceeding, a recitation of all the relevant facts is required. Many of

---

[3] Or, more accurately, that is the best count that we can manage. We do not know whether the period of service of some members of the Board may have overlapped two votes or whether (if there was overlapping) any member changed his or her vote.

the facts are taken from this court's opinion in *Jaffee II, supra.* Additional facts found in the record are added.

Applicant was born in 1944. He was admitted to practice law in California in 1975. From 1975 to 1982, he practiced criminal defense law in Sacramento, California. While practicing in California, applicant served two days in jail for contempt of court relating to his presentation of the defense in a criminal jury trial and, on another occasion, was fined $50.

In September 1982, applicant's wife, who also was his sole employee, was killed. The circumstances surrounding her death are, to say the least, troublesome.[1] In June 1983, applicant purchased a home and some land in southern Oregon with the proceeds of a $200,000 life insurance policy which had insured his deceased wife.

In 1985, based on stipulated facts, the Supreme Court of California suspended applicant from the practice of law for one year for three separate instances of admitted neglect of client matters and unprofessional conduct which had occurred in 1981-82. The 1985 stipulation recites in part:

"IT IS STIPULATED that from the foregoing facts it be concluded as a matter of law that Respondent [Jaffee] admits that he withdrew from employment prior to taking reasonable steps to avoid foreseeable harm to the rights of his clients, including delivering to his clients all papers and property to which his clients were entitled, in violation of Rule 2-111(A)(2) of the Rules of Professional Conduct of the

---

[1] Applicant's 1985 presentence report, offered in evidence by applicant, states in part:

"According to Sacramento Police Department Crime Report #82-57841, during the course of an investigation concerning the homicide of [applicant's] wife (September 29, 1982) an anonymous caller alleged that [applicant] and his wife had been 'dealing crank.' [Applicant's wife] had been gunned down while sitting in her car. Another victim whom she was meeting apparently regarding money owed on some firearms was wounded. According to a local sporting goods proprietor, [applicant and his wife] traded numerous guns with his store and on one occasion, one of the guns had been reported stolen. When questioned by police, [applicant] was evasive and indicated that he would take care of the situation himself. Statements of the victim and numerous witnesses were conflicting and apparently the case was never prosecuted."

Applicant has never challenged the accuracy of the Sacramento Police Department's version of the circumstances surrounding the homicide. *See* ORS 137.079 *et seq* (copy of presentence report shall be given to defendant before sentencing and defendant may challenge accuracy of report).

State Bar of California; failed to use reasonable diligence and his best judgment in the exercise of his skill and in the application of his learning in an effort to accomplish, with reasonable speed the purpose for which he was employed, in violation of Rule 6-101(2); and breached his oath and duties as an attorney at law, in violation of Sections 6068 [Duties of Attorney] and 6103 [Required Communication to Client] of the Business and Professional Code."

That suspension was stayed and he was placed on probation for one year, subject to certain stipulated conditions, including a condition that he pass the Professional Responsibility Examination within a year.

Applicant testified in *Jaffee I* that his neglect of client matters and unprofessional conduct in 1981-82 was the result of his reaction to the death of his wife. However, the record shows that four of applicant's clients filed complaints with the California State Bar and that three of those complaints related to unprofessional conduct that occurred *before* applicant's wife's death. The hearing panel specifically found that applicant's testimony on that issue was not consistent with the facts. Applicant's testimony in that regard appears to be untruthful.

During his first two and one-half years in Oregon, 1983-85, applicant was not employed. His sole sources of income during that time were life insurance proceeds and money he obtained by selling antiques at flea markets. During that period, he used marijuana almost daily, also used amphetamines, and occasionally experimented with cocaine and LSD.[2] Applicant testified that he purchased illegal drugs in Sacramento and brought them back to Oregon.[3] When applicant was asked whether, as an officer of the court, he would disclose his sources of illegal drugs, he answered "No."[4]

---

[2] Applicant had used a number of different controlled substances as a young man and his use of marijuana continued throughout law school and during the years of his law practice in California.

[3] By purchasing illegal drugs in California and transporting them to Oregon, applicant certainly violated several California, Oregon, and federal criminal laws.

[4] Applicant testified about his illegal drug use during that period as follows:

"Q. Did you see yourself as someone who ought to abide by the law?

"A. Yes, I did.

In 1985, police searched applicant's Oregon property pursuant to a warrant. The 1985 Department of State Police Information Report, offered in evidence by applicant, states:

"At approximately 9:25 AM on 8-06-85 the listed raid team served the search warrant at the residence. Present inside the residence were [applicant] and CAROL HAM-METT. * * *

"[Applicant] advised that he had marijuana growing around the house, on the upstairs patio and in the upstairs room across from his bedroom. He advised he did not have other plants scattered about his property. The marijuana growing next to the house was that spotted from the air. On the patio were growing plants in movable pots. Also along the railing of the patio were starter pots and a tray of water that contained marijuana seeds covered with gauze cloth waiting to sprout.[5]

"In searching the residence a container was found that contained individually packed baggies of marijuana. Also found were other items and containers of marijuana and paraphernalia. Also found was a needle kit such as used for methamphetamine and/or cocaine injection. (Hammett was observed to have needle marks on her arms). Weighing scales were found at the residence near the marijuana. Photo albums containing pictures of growing marijuana were found. Two rolls of exposed film were located and seized. The film was sent to GHQ for processing. Found in the bedroom was a briefcase that contained books for manufacturing illegal drugs as well as notebook written in hand describing formulas for making methamphetamines. Another briefcase was found to contain literature for ordering supplies for the manufacture of drugs. Also found was an encyclopedia

---

"Q. Why didn't you [abide by the law]?

"A. I guess I felt it was personal, that it was affecting no one but myself, and if I wasn't bothering anybody, I didn't see why they should be offended by it."

[5] Applicant testified in *Jaffee III*:

"In the affidavits that some of the federal attorneys or officers had made regarding the value of this marijuana, they estimated that if a hundred and forty-three plants grew to full fruition, were all what's known as sinsemilla bud — or seedless bud marijuana and they each grew several pounds of bud per each plant that the value of this crop would have been I believe they estimated a million and a half dollars."

relating to drugs. Some miscellaneous record papers were seized relating to past and current domicile.

"Inside the residence were thirty some odd weapons, mostly handguns and including rifles and shotguns. Found were lists giving all police agency radio frequency numbers and license numbers of undercover cars in California. Those cars gave California tag numbers and car descriptions. Also found were many articles of jewelry, silver coins, stamps, knives and silverware. These articles were not displayed as such, but rather stuffed here and there in boxes, purses and other containers. In looking through the photo albums it is apparent that [applicant] has ties with the Misfit Motorcycle Club in Sacramento, CA."

Applicant told the police that the 143 marijuana plants found on his property were being grown solely for his own personal use and that he was not engaged in any manner in the distribution or commercial sale of marijuana.[6] Applicant also told the police that the scales, drug-related literature, and firearms found in his home were acquired either as partial payment for fees earned in his criminal defense practice in California or in a manner unrelated to any illegal drug activity.

---

[6] Applicant's assertion that his illegal drug use was "personal, that it was affecting no one but himself," is contradicted by his own testimony that his cultivation of marijuana also was for the use of his female companion.

Applicant testified in *Jaffee II* that he realized that 143 marijuana plants sounds like "an outrageous number" of plants to have for his own personal use. Applicant explained:

"My purpose in growing [the marijuana] was not to be able to go back down to California to sell it, but to avoid having to go to California to buy it, aside from the travel and the economic savings."

When asked if he had any intention of selling the marijuana, applicant testified:

"No. As I've said before, I — you know, certainly the thought of it crossed my mind. It wasn't my intention to achieve that purpose in planting them or growing them.

"* * * * *

"As I've said today and in the past, yes, I — certainly considered it. And all I can tell you is I took no steps to move it along towards fruition. I, you know, made no plans or contracts with anyone to sell it to. I considered it."

The Board noted in *Jaffee III*:

"Applicant's testimony about kilograms or bales of marijuana was given in the context of his explanation that the scales he possessed would not have been appropriate for a sophisticated marijuana operation, because they only weigh in grams or ounces. Thus, when applicant tries to explain his scales, he talks of his potential marijuana production in large quantities, but when he talks of his marijuana crop itself, he minimizes its quantity."

Applicant was indicted for Manufacture of a Controlled Substance, ORS 475.992(1)(a), a Class A felony, and for Possession of a Controlled Substance, ORS 475.992(4), a Class B felony. As a result of a plea bargain, he was allowed to plead guilty to the felony manufacture charge and the possession charge was dismissed. This court already has determined that such conduct likely would have resulted in applicant's disbarment if he had been an Oregon lawyer at the time. *In re Jaffee, supra*, 311 Or at 164. Also based on that plea bargain, his female companion was allowed to plead guilty to a lesser charge of Frequenting A Place Where Controlled Substances Are Kept, ORS 167.222, a Class A misdemeanor, and she was placed on three years supervised probation and fined $750.

A presentence investigation was ordered in connection with applicant's conviction. Applicant told the presentence investigator that he briefly considered selling the marijuana, but did not think that he would follow through. Applicant's 1985 presentence report states:

"[Applicant] is a forty-one year old, unemployed, married male who has been convicted of MANUFACTURE OF CONTROLLED SUBSTANCE. The instant offense involved [applicant] growing 143 marijuana plants ranging in height from several inches to six feet. Additionally, authorities confiscated packed marijuana, scales, information on the manufacture of illegal drugs, California police agency radio frequency numbers and license numbers of undercover vehicles. [Applicant] indicates that he intended the marijuana to be used for his personal use, but admitted briefly contemplating using it for profit. [Applicant] denies prior cultivation of marijuana or the manufacture or selling of other illegal drugs. As indicated in the investigation concerning his wife's homicide, aspects of [applicant's] previous lifestyle are questionable at best.

"Probation is recommended as [applicant] has no prior record. However, due to the number of plants involved, a rebuttable presumption of potential of intended sales is indicated and a minimal jail sentence is considered appropriate. Additionally, it is noted that [applicant], of all people, was aware of the consequences of his actions. A fine was also considered as a sanction, but due to the government's seizure of his house, further monetary sanctions seem superfluous. However, a community service obligation will be recommended in lieu of a fine. Special conditions consistent with [applicant's] drug involvement will also be recommended."

In December 1985, imposition of sentence was suspended for two years and applicant was placed on probation. Several specific conditions of his probation are significant. First, applicant was ordered to abide by "the standard written Conditions of Supervision of the Corrections Division" and to "conduct himself as a law-abiding citizen." Second, applicant was ordered to perform two hundred hours of community service. He performed the community service as a legal assistant at the Center for Non-Profit Legal Services, Inc., for about six months.[7]

In the spring of 1986, while on probation for his drug-related felony conviction, applicant was involved in an ongoing dispute with Frank Hamm, a man whom applicant claimed had failed to pay him the balance due on the purchase of applicant's travel trailer. During that dispute, applicant threatened Hamm's life. When the police investigated that threat, applicant stated that he had no intention of carrying it out. However, the very next day, applicant posted placards on community bulletin boards in public places calling Hamm a "thief" and a "punk," and warning him that "you can run, but you can't hide." A few days later, applicant saw Hamm on the street. Applicant yelled at Hamm and called him abusive names. The two men then became engaged in a fight which, apparently, was stopped by police, who had been summoned by onlookers. As a result of that altercation, Hamm filed a criminal complaint against applicant. Although applicant acknowledged that his anger towards Hamm at that time was "irrational," he nevertheless didn't think that "[his] acting out, even out of anger, was excessive." Applicant testified in *Jaffee III*:

> "* * * I didn't set out, you know, to beat him up or to, you know, exact retribution violently. I didn't go out after him,

---

[7] The Board observed in *Jaffee I*:

"[Applicant's] work at Legal Services, Inc., conforms to the 'participation in activities for the public good' rehabilitative factor identified in [*In re*] *Rowell*, [305 Or 584, 591, 754 P2d 905 (1988)].

"Here again, however, there are some material differences between his case and *Rowell*. In *Rowell*, the applicant's public service activities as a law student were voluntary and were 'motivated by a desire to protect and further important legal principles.' 305 Or at 591. Conversely, [applicant's] work for Legal Services, Inc. was, at least initially, compelled as a 'community service' condition of his probation."

other than that first day when I didn't find him, and I don't
— I can't honestly say what would have happened had I. I
don't believe that I would have killed him. That wasn't my
intention or my goal."

When asked why he had not taken legal action to collect the
debt, applicant acknowledged knowing at the time that
Hamm was financially unable to pay, because he didn't have
anything.

On hearing about applicant's altercation with
Hamm, applicant's probation officer went to applicant's
home. After verifying that applicant had, in fact, threatened
Hamm's life, the probation officer searched applicant's home
and discovered that he still possessed eleven firearms, includ-
ing two loaded pistols. Applicant testified in *Jaffee II*:

"There were some smooth bore rifles, shotguns, and a
couple [of] hand guns, none of which were fully automatic.
None of the weapons were illegal except in my possession,
and only some of those. As having been convicted of a felony,
I wasn't entitled to have the hand guns."

Applicant stated that he had kept the guns because his female
companion felt unsafe in their rural location. Applicant
acknowledged that he knew it was unlawful for a convicted
felon such as himself to possess a firearm. *See* ORS 166.270
(Felon in possession of a firearm, a Class C felony). Notwith-
standing, he argues that the conditions of his probation did
not specifically prohibit gun ownership. However, his proba-
tion officer testified that a specific term of applicant's written
conditions of probation was that he "abide by the standard
written Conditions of Supervision of the Corrections Divi-
sion," and that one of those standard written conditions was
that a felony probationer may not use or possess a firearm.[8]
The probation officer testified further that he had read the

_____

[8] While there was perhaps little to be gained by applicant in arguing against the
record about the terms of his criminal probation, the Board nevertheless determined
that applicant's testimony on that point was, at best, misleading, and, at worst,
deceptive and untruthful.

The purpose of applicant's argument on that point, however, is puzzling.
Applicant is an experienced criminal defense lawyer. He admits that he knew it was
unlawful for him to possess a firearm, whether or not his probation conditions
specifically prohibited him from doing so. The Board concluded that "applicant's
position on this topic [is] a misleading attempt to minimize or discount the cause of
[his] probation revocation."

standard conditions of probation to applicant and that applicant had acknowledged those probation conditions in writing in his presence. Thus, once again, applicant's testimony in that regard appears to be untruthful.

In June 1986, applicant was charged with violations of his probation. The record does not indicate why he was not charged at that time with a violation of ORS 166.270 (Felon in Possession of a Firearm). In July 1986, applicant's probation was revoked. He did not challenge the lawfulness of the probation revocation. Applicant's probation thereafter was reinstated and extended for two years with the additional condition that he serve six months in the county jail, which he subsequently served. After his release, he continued to work as an employee for the Center for Non-Profit Legal Services, Inc. In March 1988, over his probation officer's objection, applicant's petition for early termination of his probation was granted.

In April 1987, applicant first disclosed his 1985 Oregon felony conviction to the California State Bar. In a letter to his California State Bar probation monitor, applicant wrote in part:

> "I also wish to bring another matter to your attention and to ask your advice and/or direction. On December 18, 1985 I was convicted, upon my plea of guilty, of the felony offense of manufacture of a controlled substance (marijuana) in the Circuit Court of the State of Oregon, for Jackson County, in case number 85-2828-C-2. It was my belief that such matters were to be reported by the Court Clerk to the State Bar. However, I have had no communication regarding this. Can you tell me what notification should be made or what steps I should take?"

Applicant does not explain why he believed that the Jackson County "Court Clerk" would report his conviction to the California State Bar.[9] Applicant's delayed reporting of his felony conviction apparently violated a condition of his California suspension, i.e., that his quarterly reports to the

---

[9] Generally, it is the responsibility of a probationer, in this case applicant, to notify the probation officer that the probationer has violated his probation. Applicant had a duty to timely notify the California State Bar that he had been convicted of a Class A felony in Oregon while he was under suspension by the California Supreme Court.

California State Bar should state that during the reporting period he has complied with all terms of his probation, or he "shall report and explain any and all violations therefore." Moreover, applicant's failure to notify the California State Bar of his felony conviction apparently violated California law that required that within thirty (30) days an attorney must report to the State Bar, in writing, any criminal conviction or improper conduct. Cal Business & Professions Code §§ 6002 and 6068.

More importantly, however, in his letter to the California State Bar, applicant failed to disclose that his probation had been revoked in 1986 for threatening to kill Hamm and for felony illegal possession of firearms, and that, as a result, he had served six months in jail. In September 1987, the State Bar of California notified the California Supreme Court that applicant had been convicted of a felony in Oregon in 1985. That notice, however, did not disclose that applicant's felony probation had been revoked in 1986.

Once again, applicant entered into a stipulation for proposed discipline with the California State Bar. Applicant and a State Bar hearings attorney stipulated that "the facts and circumstances surrounding [applicant's] violation of Oregon Revised Statute 475.992 [Manufacture of a Controlled Substance, a Class A felony] do not involve moral turpitude but do involve other misconduct warranting discipline." In June 1988, the proposed stipulation for discipline was approved by an 8-4 vote of the state bar disciplinary committee. The four dissenters voted "No" on the ground "that the stipulated degree of discipline recommended appears insufficient in view of the stipulated facts." Three of those four dissenters also objected on the additional ground "that it appears from the stipulated facts that [applicant's] conduct involved moral turpitude * * *." In April 1989, applicant was suspended by the California Supreme Court from practice for three years, six months of which he served, followed by two and one-half years of monitored probation. In 1992, the California Supreme Court reinstated applicant. It is not clear from the record whether the California Supreme Court ever was advised that applicant's probation was revoked in 1986 or that he served six months in jail.

### Jaffee I

In 1987, applicant passed the Multistate Professional Responsibility Examination, and in 1988, the Oregon Bar examination. In 1988, he applied for admission to the Oregon State Bar. In 1989, the Board did not recommend his admission. He did not seek review of that decision by this court.

### Jaffee II

In 1990, applicant reapplied for admission. After another hearing, eight members of the Board voted in favor of admission, two recommended a conditional admission, and two voted against admission. The Board's Opinion and Recommendation at that time states in part:

> "Clearly, [applicant's] discipline as an attorney in another jurisdiction for neglect of client's matters, conviction of a major felony, and current probation from a second disciplinary matter, are conduct and acts, which if not evidence of moral turpitude, would cause a reasonable person to have substantial doubts about the person's honesty, respect for the rights of others and laws of the state and nation.
>
> "* * * * *
>
> "As in the prior Opinion and Recommendation of this Board, some members of the Board continue to question the credibility of [applicant's] explanation that the cultivation of substantial quantities of marijuana were solely for his own use and that he was an unpredictably successful gardener."

This court initially denied applicant's admission by an order dated September 18, 1990, without receiving written or oral arguments. He petitioned for reconsideration before this court. This court thereafter provided the same review it would have provided if he had appealed an adverse recommendation by the Board. In *In re Jaffee, supra*, this court denied applicant admission to the Bar on the procedural ground that five years had not yet elapsed since he had committed acts that, had they been committed by a member of the Bar, likely would have led to that person's disbarment.[10]

---

[10] Because *Jaffee II* was decided on a procedural ground and not on the merits, most of this court's opinion in that case is *dicta*. That *dicta*, however, reflected the unanimous view of this court at that time.

This court's analysis in *Jaffee II*, included the following:

"Applicant committed criminal acts that reflected adversely on his honesty, trustworthiness, and fitness to practice law and engaged in conduct prejudicial to the administration of justice, in violation of DR 1-102(A)(2) and (4). ORS 9.527(4); *see generally* ABA Standards for Imposing Lawyer Sanctions § 5.1 (failure to maintain personal integrity). *Four factors lead us to conclude that we likely would have disbarred him for those violations*: (1) the seriousness of the crime of which applicant was convicted; (2) the length of time during which criminal conduct occurred; (3) the commission of more than one offense; and (4) the presence of aggravating factors. First, the acts were serious; they included a Class A felony and a threat of violence. *See* ORS 9.527(2) (Supreme Court may disbar attorney for conviction of a felony). Second, applicant's criminal behavior extended over a substantial period — over three years by his own admission. Third, applicant committed two distinct kinds of acts, manufacture of a controlled substance by cultivating marijuana and violation of probation for a threat of violence and for possession of firearms, which he knew was illegal. Fourth, aggravating factors were present: prior discipline (albeit for a different kind of conduct in a different state) and selfish motives, particularly in the circumstances of the threat that precipitated the revocation of probation, in addition to a pattern of criminal conduct over time and multiple offenses." 311 Or at 164. (Emphasis added.)

### Jaffee III

Less than six months later, applicant reapplied for admission. In the meantime, this court had amended the rules for Admission of Attorneys to provide that contested character and fitness hearings should be conducted by a Board of Bar Examiners hearing panel consisting of three members of the Board, one of whom shall be a public member. *See* RFA 9.05 *et seq* (evidentiary hearing for applicant whose character or fitness to practice law is at issue). That procedure was followed here.

### HEARING PANEL FINDINGS AND RECOMMENDATION

The three-member hearing panel unanimously recommended that applicant's application for admission be

denied. After reciting the relevant evidence in the record, the hearing panel's opinion states in part:

"The issue before this hearing panel * * * is not so much what applicant has done, but whether he presently possesses the necessary good moral character for admission to the Bar.

"While the issue before the hearing panel involves applicant's present moral character, it is his current explanation of past conduct that was of most concern to the hearing panel. Specifically, the hearing panel is not convinced of applicant's candor in explaining his past conduct. After a careful review of all the evidence presented, the hearing panel concludes that applicant has not shown himself to be a candid and credible person and, therefore, has not established by clear and convincing evidence that he now has the good moral character required to practice law. The hearing panel's conclusion is based primarily on applicant's present statements about his past acts. *In re Fine*, 303 Or 314, 330, [736 P2d 183] (1987)."

The hearing panel concluded:

"The hearing panel concludes that applicant has not been fully candid and truthful in his testimony and that he therefore does not possess the good moral character to be a member of the bar. Applicant's testimony before the hearing panel, and his prior testimony before the Board, were under oath. There may be no requirement more central to the idea of good moral character, as it applies to those who would practice law in this state, than truthful testimony under oath. Applicant had the burden of showing by clear and convincing evidence his good moral character. The hearing panel concludes that applicant has failed to meet the burden, and therefore recommends that his re-application for admission be denied."

As to applicant's 1986 California suspension, the hearing panel found:

"Applicant was suspended from the practice of law in California in 1986 for the neglect of client matters and unprofessional conduct. Applicant has consistently attributed this neglect and unprofessional conduct to the emotional problems he suffered as a result of his wife's death in September, 1982. In his application, he states that he was suspended from the practice of law and placed on probation for a year 'for failure to complete representation on several civil matters following his wife's death.' One of these civil

matters involved clients named Sielinski. At applicant's first hearing before the Board, he was asked if his negligence in regards to the Sielinski case occurred in 1981. He answered no. Applicant also testified that none of the problems or failures to cooperate or return phone calls to the Sielinskis occurred before his wife's death. He testified that the Sielinski case was being handled up to the time of his wife's death and, as far as he knew, there was no failure to communicate with the Sielinskis prior to that. At the hearing before this hearing panel, applicant testified that up until his wife's death he believed he was taking care of business. He testified that the Sielinski matter would not have come to the attention of the California State Bar absent his wife's death. Thus, applicant maintains that his negligence and unprofessional conduct in regards to the Sielinski case occurred after his wife's death in September, 1982.

"*Applicant's testimony is not consistent with the facts.* The California State Bar alleged that after May 22, 1981, applicant failed to return numerous telephone calls to the Sielinskis, and on or about March 7, 1982 and August 18, 1982, the Sielinskis wrote applicant requesting information concerning their case and applicant failed to respond. In connection with a settlement of the California State Bar's complaint, applicant signed a stipulation as to facts and discipline which, in part, concerned the Sielinski case. Applicant's stipulation recited that the Sielinskis hired applicant on April 13, 1981, in connection with damages they incurred on February 28, 1980. The stipulation provided that during 1981 applicant took minimal substantive action on behalf of the Sielinskis, and that he failed to file a complaint before the relevant statute of limitations expired. According to applicant, the statute of limitations for this claim was two years and, therefore, would have expired by February 28, 1982. The stipulation further provided that after April 13, 1981 applicant failed to respond to the Sielinskis' telephone calls and correspondence requesting information on their case.

"Applicant stipulated in a judicial proceeding involving his own misconduct that his acts of neglect and professional misconduct involving the Sielinski case occurred prior to his wife's death in September, 1982. In fact, his negligence in not filing suit for the Sielinskis occurred not later than the end of February, 1982. *Applicant's Stipulation of Facts before the California State Bar, and other evidence, is directly contrary to his testimony before the Board and this hearing panel that none of his neglect and professional misconduct in the*

*Sielinski case occurred before his wife's death, but was caused by his wife's death. The hearing panel finds that applicant is being untruthful in attempting to attribute his neglect and professional misconduct to the tragedy of his wife's death.*" (Emphasis added; citations omitted.)

As to applicant's 1986 probation revocation, the hearing panel found:

"In July, 1986, applicant's probation arising out of his conviction for manufacture of a controlled substance was revoked because he threatened another man with violence and was in possession of firearms. While working for Legal Services, Inc. in the spring of 1986, during the community service portion of his sentence, applicant became involved in a dispute with a man who he claimed failed to pay the balance of a debt for the purchase of a travel trailer. During this dispute, applicant threatened the man's life by telling the man's brother, 'If Frank didn't get a hold of me by midnight, or in six hours, he was going to be dead man.' In addition to this threat, applicant posted placards in public places calling the man a 'thief' and a 'punk' and stating 'You can run, but you can't hide.' This activity culminated in an altercation in a parking lot between applicant and the man he had threatened.

"Believing this conduct was a violation of applicant's probation, his probation officer, Pat Mimnaugh, went to applicant's home in June, 1986. Besides verifying that applicant had threatened the debtor's life, the probation officer searched applicant's home and discovered that applicant still possessed firearms. Specifically, applicant had eleven firearms, including two loaded pistols. One of these pistols was under the bed of applicant and his female companion. Applicant testified in the first hearing before the Board that the guns were loaded because his female companion felt unsafe.

"At the first hearing before the Board, applicant testified that he knew it was against the law for a convicted felon to own a firearm, but he asserted that his probation conditions did not prohibit gun ownership: 'It was not a condition of any probation. I was told that.' In contrast, Mr. Mimnaugh testified at the first hearing that one of the specific conditions to applicant's probation prohibited the use or possession of a firearm. Mr. Mimnaugh testified that he read the conditions of probation to applicant and that applicant signed the probation conditions. *This discrepancy between applicant's testimony and Mr. Mimnaugh's*

*testimony was detailed in the Board's first opinion, a copy of which was sent to applicant.*

"Notwithstanding that the Board's first opinion specifically detailed the conflict between applicant's testimony and his probation officer's testimony, at applicant's second hearing before the Board he testified that although he did not doubt that a prohibition against the use or possession of firearms was a standard condition of the probation department, he also testified that a prohibition against the use or possession of firearms was not a term of his probation. *Applicant's testimony that a prohibition against his use or possession of firearms was not a term of his probation is, at best, misleading. Even if applicant forgot that a firearms prohibition was a condition of his probation (unlikely for an experienced criminal lawyer), he was clearly reminded of this at the first hearing before the Board when Mr. Mimnaugh testified.*" (Emphasis added; citations omitted.)

As to applicant's marijuana production, the hearing panel found:

"In August, 1985, when law enforcement officers raided applicant's property they found 143 marijuana plants ranging in size from tiny seedlings to tall plants. Applicant has consistently testified before the Board that this marijuana was grown for personal consumption. Applicant testified he grew this marijuana to smoke it and so he would not have to go to California to buy it. He described this marijuana cultivation as a 'stupid — gardening activity' in which he became emotionally involved. *The issue presented by applicant's testimony that he grew the marijuana as a gardening activity solely for personal consumption is whether this testimony is fully candid and truthful. This hearing panel concludes that it is not for two primary reasons. First, applicant's own testimony is self-contradictory. Second, the quantity of the marijuana grown was in commercial quantities and is not consistent with personal consumption.* (Emphasis added.)

The hearing panel explained why it had concluded that applicant's testimony about his marijuana crop was not candid and truthful:

"(a) *Contradictory Statement and Testimony*

"A presentence investigation was done in connection with applicant's conviction for manufacture of a controlled substance. Applicant told the presentence investigator that

he briefly considered selling the marijuana but he did not think that he would have followed through. At both the first and second hearings before the Board, applicant testified that he did consider selling marijuana, although he said that he never took any overt steps to sell it. At the third hearing before this panel, applicant testified that it was not his intention to sell marijuana, although he considered it, but he took no steps to contact anyone to sell it.

"The hearing panel finds it noteworthy that the first time that the Board asked applicant about his purpose in growing marijuana he testified that he did so 'to be able to smoke it,' and maintained that it was only for his personal use. When asked further about the quantity of marijuana, applicant testified that it was fun gardening the marijuana. It was later, when applicant was pressed as to his intentions, that he said that he considered selling the marijuana: 'Yes, I certainly considered it. All I can tell you is I took no steps to move it along toward fruition. I, you know, made no plans or contacts with anyone to sell it to. I considered it.'

"*The hearing panel finds this testimony troubling because it is contradictory*. Applicant has clearly attempted to convince the Board that he was growing marijuana solely for personal consumption. Yet when pressed, applicant conceded that he considered selling the marijuana. If applicant had an intent to grow marijuana solely for his personal consumption, then he would not have considered selling it. On the other hand, if applicant grew marijuana while he considered selling it, then he had an intent both to consume it and, possibly, to sell it if his cultivation efforts succeeded. The contradiction, therefore, is in applicant's testimony as to his intentions.

"(b) *The Quantity of the Marijuana*

"If applicant had grown one or a few marijuana plants, the apparent conflict in his testimony as to whether he grew it solely for personal consumption or also considered selling it would not be as troubling to the hearing panel. But this hearing panel finds applicant's testimony very troubling when it is considered in light of the quantity of marijuana he was growing. Applicant was growing 143 marijuana plants. At the second hearing, applicant testified that he and his wife consumed about a half to one ounce a week of marijuana. He also testified that he thought that the marijuana he was growing would produce about five to ten pounds and maybe more. If applicant and his wife consumed two ounces of marijuana a week, and if the marijuana he was growing did

produce ten pounds, or 160 ounces, the marijuana applicant was growing would have produced an 80-week supply. Applicant admitted that 143 marijuana plants would produce far in excess of anybody's ability for personal use. Applicant also conceded that 143 marijuana plants raised to maturity would create a great deal of marijuana, and that one would assume that this quantity of successfully raised marijuana plants would cause a person to deal with kilograms or bales as opposed to ounces. According to Mr. Mimnaugh, 143 plants of various size is a very significant amount of marijuana and would be more than ten or twenty would use in a year.

"At the hearing before this hearing panel, applicant dismissed as farcical the affidavits of federal officers that said that 143 marijuana plants grown to full fruition could have a crop value of a million and one half dollars. This estimated value may be greatly exaggerated. But the point remains that 143 marijuana plants could produce a crop with a significant illegal commercial value.

"Not only was applicant growing 143 marijuana plants, he intended to grow more. Applicant's arrest information report states that along the railing of applicant's patio were starter pots and a tray of water that contained marijuana seeds covered with cloth waiting to sprout. When applicant was asked why he had more seeds under water that he was trying to bring to start, he responded that he became involved emotionally and psychologically in the process of growing the marijuana and he did not think that the existing plants were likely to survive. If applicant was only raising marijuana for personal consumption, he would not care if a few, or many, of his 143 plants died, nor would he back up his 143 growing plants with more seeds. *The evidence strongly indicates applicant was involved in farming commercial quantities of marijuana.* And if applicant intended to produce marijuana in commercial quantities, he must have had an intent as to how he would dispose of commercial quantities of the marijuana.

"The Board's first opinion recommending against applicant's admission stated: 'Some (but not all) members of the Board's majority found from [applicant's] testimony that he was cultivating substantial quantities of marijuana solely for his own consumption to be incredible.' The Board's second opinion which recommended applicant's admission stated:

" 'As in the prior Opinion and Recommendation of this Board, some members of the board continue to question

the credibility of [applicant's] explanation that the cultivation of substantial quantities of marijuana were solely for his own use and that he was an unpredictably successful gardener. However, the mere suspicion of a lack of candor will not support the denial of admission. *In re Tobiga*, 310 Or 46[, 791 P2d 830] (1990).'

*"This hearing panel concludes that the evidence supports far more than a mere suspicion of a lack of candor on applicant's behalf. To the contrary, this hearing panel concludes that applicant's testimony, in light of its contradictory nature and in light of the quantity of marijuana being grown, is evasive, self-serving and lacks complete candor and credibility.* Applicant was a mature, intelligent adult when he was growing marijuana. He was also an experienced criminal defense lawyer. The hearing panel does not believe applicant's testimony that he was growing commercial quantities of marijuana for fun and so he and his wife could smoke an ounce or two per week. *The hearing panel finds that applicant was growing commercial quantities of marijuana for a commercial purpose, and that applicant's testimony to the contrary is not truthful."* (Emphasis added; citations omitted.)

The hearing panel unanimously concluded that applicant had not been candid and truthful in his testimony and therefore he did not possess the good moral character to be a member of the bar and recommended that applicant not be admitted to practice in Oregon.

### BOARD OF BAR EXAMINERS REVIEW

The Board reviewed the hearing panel's opinion and recommendation and applicant's exceptions thereto. The Board recommended that applicant's application be denied.

The Board explained:

"In evaluating whether Applicant is 'rehabilitated and presently possesses the necessary good moral character for admission,' the Board is concerned with the Applicant's present moral character. Applicant has presented considerable evidence of his good moral character in the form of testimony and written submissions from character witnesses who have known Applicant since he was granted an early termination of his probation in 1988. Although this evidence was presented, for the most part, in Applicant's two previous hearings before the Board, the evidence is incorporated into the record of the Board's present recommendation and has

been reviewed and given appropriate weight and consideration by the Board.

> *"What is troubling to the Board, however, is Applicant's explanation of his past conduct. Specifically, the Board is not convinced that the Applicant has been truthful in explaining his past conduct.* In reaching this conclusion, the Board recognizes that an application for admission should not be denied 'on mere suspicion.' *In re Tobiga, [supra,* 310 Or at 52.]"* (Emphasis added.)

The Board concluded:

> "After a careful review of all of the evidence presented, the Board concludes that Applicant has not shown himself a truthful and credible person and, therefore, has not established by clear and convincing evidence that he now has the good moral character required to practice law. The Board's conclusion is based primarily upon Applicant's statement about his past acts."

Pointing specifically to applicant's testimony about his marijuana crop and his probation violation, the Board concluded:

> "[T]hat Applicant has not been fully truthful in his testimony and that he does not presently possess the good moral character to be a member of the Bar. Applicant's testimony before the Hearing Panel, and his prior testimony before the Board, were under oath. There may be no requirement more central to the idea of good moral character, as it applies to those who seek to practice law, than truthful testimony under oath.
>
> "Applicant has the burden of showing by clear and convincing evidence his present good moral character. Although the Board has reviewed the evidence of rehabilitation and good character submitted by Applicant, the Board, viewing the evidence as a whole, concludes that applicant has failed to meet his burden. Accordingly, the Board recommends that Applicant's reapplication for admission be denied."

Four members of the Board dissented. Although the Board's dissenters argue that applicant's testimony about his intent to distribute marijuana "is not facially implausible," the dissenters concede that

> "the circumstantial evidence [*i.e.,* the quantity of marijuana, applicant's possession of drug related items (scales, books, needle kit), applicant's then unemployed status and his

uncertain means of support] *certainly permits a reasonable inference that Mr. Jaffee had some commercial distribution intention.*" (Emphasis added.)

The dissenters continue:

"Although we are thus inclined to accept the majority's conclusion that [applicant] has not established by clear and convincing evidence that he did not intend to distribute some of the marijuana, we do not believe that the majority's conclusion in this respect is highly certain."

The dissenters, thus, have mistakenly shifted the burden of proof from applicant to the Board, a legal error that completely undermines the validity of their ultimate conclusion.

Moreover, the Board's dissenters close their opinion with this astonishing confession to a "result-oriented" conclusion:

"Even if we agreed with the majority's conclusion of the probation terms issue (which is overall a fairly insignificant concern, even if the majority's conclusion is correct), and even if we attached more importance to the majority's conclusion with respect to commercial distribution of the marijuana, we would still reach the same ultimate conclusion: [applicant] has established his good moral character by clear and convincing evidence."

In other words, the dissenters conclude that, *even if* applicant was not candid on the "probation terms" and "commercial distribution of the marijuana" issues relied on by the Board, nevertheless, he is a person of good moral character who should be admitted to practice in Oregon. I could not disagree more. *See In re Nash*, 317 Or 354, 362, 855 P2d 1112 (1993) ("The question is whether *in all respects* [the applicant] is a person who possesses 'the sense of ethical responsibility and the maturity of character to withstand the many temptations which [he] will confront in the practice of law' " quoting *In re Taylor*, 293 Or 285, 296, 647 P2d 462 (1982) (emphasis in original)). Present untruthful statements to a hearing panel about past conduct constitute evidence of a lack of good moral character. *In re Gortmaker*, 308 Or 482, 488, 892 P2d 421 (1989); *In re Fine, supra*, 303 Or at 324.[11]

---

[11] The dissenting opinion contains one factual error. It states that "the only crime with which [applicant] was charged" was manufacture of a controlled sub-

Applicant agrees that his prior misconduct shows that, at the time of that misconduct, he lacked the requisite good moral character and fitness to practice law in Oregon. He testified, "I think my criminal activity substantiates that very strongly."[12] Applicant argues, however, that his more recent conduct and actions demonstrate that he presently possesses the good moral character needed for admission to practice law in this state.

The Board responds that applicant's present untruthful statements about his prior conduct constitute evidence of a lack of present good moral character. Specifically, the Board argues that applicant has not been candid in his testimony about his intentions in growing large quantities of marijuana, and that his testimony about his probation violation was, at best, misleading. The Board further argues that applicant's evidence of rehabilitation does not outweigh his lack of candor and truthfulness and, therefore, that he has not sustained his burden to show by clear and convincing evidence that he is a person of good moral character.

Applicant has the burden to establish by clear and convincing evidence that he is a person of good moral character and fit to practice law. ORS 9.220(2)(a); RFA 9.45(6); *In re Jaffee, supra,* 311 Or at 163; *In re Rowell, supra,* 305 Or at 588.

Clear and convincing evidence means that the truth of the facts asserted is highly probable. *In re Monaco,* 317 Or 366, 370 n 4, 856 P2d 311 (1993); *In re Nash, supra,* 317 Or at 357.

ORS 9.220(2)(b) provides:

"For purposes of [ORS 9.220(2)(a)] * * *, the lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial

---

stance, ORS 475.992(1)(a), a Class A felony. In fact, applicant also was indicted for possession of a controlled substance, ORS 475.992(4), a Class B felony. As a result of a plea bargain, he pleaded guilty to the manufacture charge and the possession charge was dismissed.

[12] This court likely would have disbarred him for that conduct if he had been a member of this state's bar at the time. *In re Jaffee, supra,* 311 Or at 161-64.

doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation. The conduct or acts in question should be rationally connected to the applicant's fitness to practice law."

Although present character is the issue in this proceeding, *In re Tobiga, supra*, 310 Or at 52, prior wrongdoing reflecting adversely on an applicant's character is relevant. *Id.* Any significant doubt about an applicant's present moral character must be resolved in favor of protection of the public by denying admission to the applicant. *In re Nash, supra*, 317 Or at 362; *In re Easton*, 298 Or 365, 367-68, 692 P2d 592 (1984) (citing *In re Alpert*, 269 Or 508, 518, 525 P2d 1042 (1974)), *cert den* 472 US 1012 (1985). This court has recognized, at least in theory, that an applicant guilty of unlawful or unprofessional conduct may establish present good moral character through sufficient proof of rehabilitation. *In re Rowell, supra*, 305 Or at 588.[13]

In a recent proceeding denying admission to an applicant seeking admission to practice of law, this court stated:

"A person who continues to misstate facts about prior dishonest conduct that could constitute a crime and about his involvement in it, in order to gain admission to practice law, does not show himself to be a credible person and does not establish that he had good moral character required to practice law." *In re Parker*, 314 Or 143, 154, 838 P2d 54 (1992).

In *Parker*, this court emphasized: "Lawyers must be honest. Truth-speaking is requisite in this profession." *Id.* at 154-55. *See also In re Fine, supra*, 303 Or at 330 ("we base our decision on applicant's present statements about his past acts. We recognize that persons can and do reform. However, in this proceeding applicant's deceitful, self-serving conduct persisted at the time of the hearing."). "[R]eformation is a very difficult matter for a petitioner to prove and for [this court] to judge." *In re Bernard Jolles*, 235 Or 262, 275, 383 P2d 388 (1963). But reformation can be proved, as this

---

[13] However, my research indicates that this court has never reinstated a lawyer after disbarment. *See In re Nash*, 317 Or 354, 361-62, 855 P2d 1112 (1993) (reinstatement after disbarment is uncommon in the legal profession, and not even possible in some jurisdictions); *In re Koken*, 214 Or 357, 360, 329 P2d 894 (1958) (reinstatement should be allowed only in very exceptional cases).

court's past decisions attest. *See, e.g., In re Rowell, supra* (illustrating proposition). As evidence of reformation, this court has looked to (1) character testimony from those who know and have had an opportunity to observe the applicant, *In re Bernard Jolles, supra,* 235 Or at 275-76; (2) participation in activities that benefit society, *In re Rowell, supra,* 305 Or at 591; and (3) and applicant's forthright acknowledgement of the wrongfulness of his or her past actions, *In re Fine, supra,* 303 Or at 314.

## ANALYSIS

Applicant concedes that his past conduct shows that previously he did not have the good moral character necessary for his admission as an attorney. The question then is whether applicant's moral character has changed sufficiently that he may be admitted to the practice of law. *In re Rowell, supra.*

Applicant has the burden to establish by clear and convincing evidence that he is a person of good moral character.[14] I proceed to consider the opinions of the trial panel and the Board that led them to the conclusion that applicant had not sustained his burden of proof in the case and, therefore, to recommend that his application for admission be denied. Those opinions focus on two principal issues: (a) applicant has not been candid regarding his intentions in growing large quantities of marijuana, and (b) applicant's testimony regarding the terms of his criminal probation was misleading.

### Early illegal drug use

Applicant has testified that he used a number of different controlled substances as a young man, that his use of marijuana had continued throughout law school, during the years of his law practice in California, and for several years after he moved to Oregon. His illegal drugs of choice have included marijuana, LSD, amphetamines and cocaine. It is obvious from applicant's own testimony that his acquisition and use of illegal drugs involved other persons in serious criminal activity. Because applicant testified that at the time

---

[14] Because this is an application for original admission and not one for reinstatement, I view the evidence in the record as whole (1975 to the present). The majority, however, appears to consider only the evidence starting in 1986 as being relevant.

of his arrest in 1985 he had been sharing drugs with his female companion, it is established that applicant furnished illegal drugs to her during that period, resulting in her conviction of a crime.

### Applicant's conduct from 1981 to 1986

Applicant's conduct from 1981 to 1986 shows anything but "good moral character." Applicant himself acknowledges that fact. During that period, applicant: (1) neglected his clients resulting in his suspension from practice in California; (2) engaged in serious criminal conduct resulting in his conviction; (3) violated his probation by committing an uncharged felony, *i.e.*, Felon in Possession of a Firearm, ORS 166.270,[15] resulting in his serving six months in jail; and (4) threatened a man's life and engaged in a fight over a debt that applicant admits he knew at the time the debtor could not pay. As a result of some of those actions, he was suspended from the practice of law in California in 1986 and again in 1989.[16] That conduct would be most disturbing in someone who was young and inexperienced, but it was appalling in someone of applicant's age.

In 1982, applicant was 38 years old and had been a practicing lawyer for seven years. From the spring of 1982 to the summer of 1986, while he was engaging in illegal drug purchases in California and a marijuana growing operation in Oregon, applicant was a member of the California Bar. Those facts distinguish this proceeding from *In re Rowell, supra*, where the applicant was considerably younger at the time of his unlawful conduct and was not a member of the legal profession.

---

[15] Neither prosecution nor conviction of a crime is necessary to permit consideration of the criminal conduct of an applicant for admission. *In re Parker*, 314 Or 143, 154, 838 P2d 54 (1992), *cert den sub nom Parker v. Oregon State Bd. of Bar Examiners*, 113 S Ct 2440, 124 L Ed 2d 658 (1993), and *Parker v. Oregon State Bar*, 114 S Ct 929, 127 L Ed 2d 222 (1994).

[16] Several factors apparently have insulated applicant from more severe discipline by the California Supreme Court: (1) applicant's Oregon felony conviction and probation violation did not relate to his practice of law in California; (2) no California client was injured as a result of applicant's criminal activity in Oregon; (3) applicant was not practicing law in California at the time of his criminal activity; (4) applicant and the California State Bar stipulated that his Oregon felony conviction did not involve "moral turpitude"; and (5) applicant's criminal conduct did not involve the California State Bar's Client Security Fund.

Applicant describes his conduct as "uncharacteristic" and attributes his actions to his reaction to the death of his wife in 1982. While anyone can understand the trauma such an event might cause, applicant's implicit argument that it somehow justifies or excuses a continuing pattern of serious criminal conduct is unpersuasive. Moreover, the record shows at least three instances of applicant's professional misconduct, *i.e.*, client abandonment, that occurred *before* his wife's death and, as noted, the hearing panel specifically found that "Applicant's testimony [on this issue] is not consistent with the facts." His attempt to attribute *all* his misconduct to that tragedy is misleading and unpersuasive.

### *Applicant's marijuana production*

Applicant testified that he was cultivating 143 marijuana plants for his own consumption. Applicant concedes that 143 mature marijuana plants would be more than anybody could possibly use for personal use "by a factor of ten or more, 15 or more, probably." He also thought that five healthy large plants would keep him and his female companion smoking marijuana daily for weeks. He added, "I certainly didn't expect that I would wind up with the full number of fully grown plants." I find his testimony on that issue unpersuasive. I agree with the Board that applicant has not been candid about his intentions in growing large quantities of marijuana.

### *Applicant's probation revocation*

Applicant testified in that he knew it was against the law for him to own a firearm. He argued, however, that the specific conditions of his probation did not prohibit gun ownership.[17] Evidence in the record, however, shows otherwise. In the written order placing applicant on probation, an express condition of the probation was that he "abide by the standard written Conditions of Supervision of the Corrections Division." Applicant's probation officer testified that applicant was presented with and signed those general conditions of probation, which included the following as General Condition No. 10:

---

[17] This should be characterized as "an argument that would only fool a lawyer."

"Obey all laws, municipal, county, state, and federal. The federal gun law of 1968 prohibits any person convicted of a crime punishable by a felony the use or possession of a firearm."

This discrepancy between applicant's testimony and that of his probation officer was identified in the Board's opinion in *Jaffee I*, a copy of which was given to applicant. Notwithstanding, applicant testified in *Jaffee II* that, although he did not doubt that a prohibition against the possession of firearms was a standard condition of probation, such a prohibition was not a term of *his* probation. The Board found that applicant's testimony in that regard is, at best, misleading, and, at worst, deceptive and untruthful. I agree.

The probation order expressly imposes as a condition of probation that applicant "abide by the standard written Conditions of Supervision of the Corrections Division," which expressly includes the requirement that applicant comply with all laws, including the federal law prohibiting convicted felons from possession of firearms. Applicant's statement that this provision was not a term of *his* probation is misleading and inaccurate. Another express provision of applicant's Order Suspending Sentence is that applicant "conduct himself as a law-abiding citizen." During his probation revocation hearing, applicant admitted, as he has to the Board, that he did not so conduct himself as a law-abiding citizen, and applicant does not contest the lawfulness of the revocation of his probation. I agree with the Board that applicant's testimony about the terms of his criminal probation was, at best, misleading and, at worst, deceptive and untruthful.

*Evidence of Reformation*

The record in this proceeding contains evidence of applicant's reformation. Although applicant's initial service at the Center for Non-Profit Legal Services, Inc., was a condition of his criminal probation, supervisors who have known and worked with him attest to his good character and his dedication to his clients, and co-workers echo those sentiments. Applicant's continuing and effective work on behalf of the disadvantaged and afflicted has been verified. It also appears that applicant's public service activities have continued. The question, then, is whether that is sufficient evidence

of rehabilitation to satisfy the demanding burden of proof of good character that applicant assumes in applying for admission to the Bar. I agree with the hearing panel and the Board that applicant's evidence of rehabilitation is not sufficient to outweigh his lack of truthfulness.

None of the references applicant has offered knew him before 1986. In *In re Rowell, supra,* 305 Or at 590, this court emphasized the importance of presenting testimony of present good moral character from witnesses who knew the applicant *both before and after* alleged rehabilitation.

Applicant's rationalizations and excuses for his past misconduct differ substantially from the applicant's regret for past actions in *In re Rowell, supra,* 305 Or at 591. Applicant's probation officer testified that applicant was not a "model" probationer, and he refused to support applicant's request for early termination of his probation. Moreover, he testified that, based on applicant's past criminal history, he would have reservations about his being admitted to the Bar.

When the hearing panel's special investigator first suggested that applicant voluntarily take a drug test, applicant balked. His explanation at that time for not taking the test seems to me to be evasive and unconvincing. His expressed willingness in 1992 to take a drug test is not reassuring, because by that time he had time to "clean up his act."

In summary, applicant has the burden to establish by clear and convincing evidence that he is a person of good moral character. On *de novo* review, and viewing the totality of the evidence, I agree with the Board that applicant has failed to sustain his burden of proof.

Applicant's untruthful statements about his prior conduct constitute evidence of a lack of present good moral character. "Lawyers must be honest. Truth-speaking is requisite in this profession." *In re Parker,* 314 Or 143, 154-55, 838 P2d 54 (1992), *cert den sub nom Parker v. Bd. of Bar Examiners,* 113 S Ct 2440, 124 L Ed 2d 658 (1993), and *Parker v. Oregon State Bar,* 114 S Ct 929, 127 L Ed 2d 222 (1994). Applicant has not been candid about his intentions in growing large quantities of marijuana. His testimony about

the terms of his criminal probation is disingenuous. Applicant's course of conduct since 1975 would cause a reasonable person to have substantial doubts about his honesty and respect for the rights of others and for the laws of this state and nation. ORS 9.220(2)(a) and (b). One certainly must question the character of a middle-aged lawyer who threatens to kill a debtor, whom that person knows at that time is unable to pay the debt. The totality of the evidence in the record from 1975 to present does not persuade me that applicant should be admitted in Oregon.

It follows, therefore, that applicant has not established by clear and convincing evidence that he possesses the requisite character and fitness for admission to practice law in Oregon. Because a "significant doubt" exists about his present moral character it follows that applicant has not established that it is "highly probable" that he has the requisite moral character and fitness to practice law. Consistent with this court's obligation to protect the public, *In re Easton, supra,* 298 Or at 368, and notwithstanding evidence of applicant's rehabilitation, I would deny applicant's application. ORS 9.220(2)(a); *In re Parker, supra*; *In re Nash, supra*; *In re Fine, supra.*

Accordingly, I dissent.

Unis, J., joins in this dissent.