Argued and submitted May 13, applicant's application for admission to the Oregon State Bar denied July 18, 2002

In the Matter of
the Application for Admission to the
Bar of the State of Oregon,

VAN ALEXANDER COVINGTON, IV,
*Applicant.*

(SC S48651)

50 P3d 233

Susan D. Isaacs, Beaverton, argued the cause and filed the briefs for applicant.

Jeffrey D. Sapiro, Oregon State Bar, Lake Oswego, argued the cause and filed the brief for the Oregon State Board of Bar Examiners.

PER CURIAM

## PER CURIAM

■  The issue in this contested lawyer admission proceeding is whether applicant has proved by clear and convincing evidence that he presently possesses the good moral character necessary for admission to the Oregon State Bar (Bar). The Board of Bar Examiners (Board) recommends that this court deny admission at this time, but grant applicant leave to reapply for admission in one year. Applicant has petitioned this court to admit him despite the Board's recommendation. This court reviews *de novo*. ORS 9.536(3); ORS 9.539; BR 10.6. For the reasons that follow, we conclude that applicant should not be admitted to the practice of law in Oregon at this time.

■  The central concern in this proceeding is applicant's history of drug and alcohol dependency and the criminal activity that sometimes accompanied that dependency. Applicant is 33 years old. He began drinking alcohol and using marijuana at age 13, was charged with driving under the influence of intoxicants (DUII) at age 16, and was convicted of a misdemeanor resulting from drunken behavior at about age 18. From 1986 to 1988, applicant continued to drink heavily and to use marijuana, was convicted of another misdemeanor resulting from a drunken assault in which he seriously injured the victim, and was fired from a job for smoking marijuana. In the spring of 1988, he began using LSD and hallucinogenic mushrooms.

In July 1988, applicant attended his first in a series of Alcoholics Anonymous (AA) meetings, and he remained sober for a year. He moved to Oregon at some point in 1988, had a three-day relapse, returned to AA, and remained sober for two more years. Applicant relapsed again in June 1991, drinking and using marijuana, cocaine, and methamphetamine intermittently over the next three years. In June 1992, he graduated from Oregon State University. In 1995, he successfully completed an outpatient program. He remained sober until 1996, when he again began drinking and using marijuana.

In the fall of 1996, at age 27, applicant began attending law school at the University of Oregon. In early 1997, he

was arrested while purchasing marijuana, and he subsequently was charged with manufacture and distribution of a controlled substance. He later agreed to implicate the seller, and the charges were dismissed. In the fall of 1997, applicant intermittently used heroin and cocaine, and, for a few months, spent $100 weekly on methamphetamine.

In February 1998, applicant (in his own words) "hit * * * bottom," began attending AA, obtained a sponsor, Maynard, and attended AA regularly through June 1999, when he graduated from law school and moved to Sandy. He obtained a new sponsor in Sandy, but later renewed his relationship with Maynard. Applicant also began attending Oregon Attorney Assistance Program (OAAP) meetings, regularly attended AA, completed an OAAP relapse prevention program, and developed a sponsor-like relationship with Sweeney, a counselor from OAAP. Applicant states that he "really began recovery on February 13, 1998[,] as opposed to just having stopped drinking," and that he has remained sober since that time.

In June 1999, applicant was interviewed by members of the Board; in July 1999, he took and passed the Bar examination. For eight or nine months in 1999 and 2000, applicant worked as a clerk/bailiff for Judge Herndon in Clackamas County. Applicant then worked as a legal secretary/receptionist for a lawyer, Smith. Applicant later began working for a temporary agency, Legal Northwest. Applicant received positive reviews from all those work experiences.

In October 1999, applicant again was interviewed by members of the Board. In January 2000, a psychologist, Dr. Pachter, evaluated applicant at the Board's request. Pachter recommended that applicant undergo psychotherapy, and applicant indicated a willingness to do so. Pachter further recommended that the therapist should not be required to report to the Board, so as not to hamper applicant's progress. Applicant did not seek therapy.

In the spring of 2000, applicant successfully participated in an OAAP relapse prevention program facilitated by Cundill. In the fall of 2000, applicant was diagnosed with depression and began taking medication, which seemed to

help him. He also attended three counseling sessions to discuss his depression; however, he was uncomfortable about the sessions, because he thought that the Board might obtain his records.

In December 2000, a three-member Board panel conducted a character review and heard from several witnesses. Maynard testified as to applicant's hard work in AA's 12-step program, his progress respecting his ability to cope, and his dedication to becoming sober. Maynard testified that applicant is honest and trustworthy, and Maynard thought that applicant would remain sober.

Sweeney testified that applicant is taking "personal responsibility" for his actions and that Sweeney has no doubts concerning applicant's honesty, trustworthiness, respect for the law, and good moral character. Sweeney also testified that, during the first year of sobriety, the relapse rate is 60 percent; after one year, it decreases to about 15 percent and, after five years, to about eight percent. In Sweeney's view, applicant has an "excellent chance" of staying sober if he continues to participate actively in AA.

Cundill reported that applicant had done "exemplary work" and had worked "incredibly hard" in the OAAP relapse prevention program, and recommended that applicant deal with his relapse issues with an AA sponsor or in therapy. In Cundill's view, applicant will do well if he continues working with a strong AA program and maintains contact with a sponsor and support group.

Three other AA members testified that applicant has demonstrated dedication and sincerity in AA, is honest, and should be admitted. Applicant's wife also testified that applicant is committed to his AA program and that he has matured and accepted responsibility. Shafer, a Multnomah County Deputy District Attorney, stated in a letter supporting applicant that he believes that applicant is honest, trustworthy, and ethical.

Finally, Judge Herndon testified that, in his opinion, applicant is "absolutely trustworthy" and honest, has good

moral character, and respects the law and the rights of others. Judge Herndon was not troubled by the fact that applicant had not volunteered any information about his criminal history or alcohol problem during his job interview with the judge. As the judge put it, "I didn't ask the question." (Applicant maintains that he "was always prepared to answer all questions truthfully" about his past if asked by a prospective employer.) Applicant did later discuss his alcohol problem (but not his prior drug use) during the course of employment. From Judge Herndon's testimony, it does not appear that he was aware, on the date of the hearing, of the extent of applicant's past drug use or criminal record. However, the judge testified that he was not concerned that applicant had not disclosed his history of criminal involvement with drugs: "I wouldn't have been concerned about that unless he was on probation or under close supervision. In other words, a recent conviction."

In July 2001, the Board recommended that this court deny applicant admission, with leave to reapply one year after the denial. The Board expressed concern that applicant had not undergone therapy, as Pachter had recommended, to explore the underlying issues leading to his earlier relapses. The Board recommended that applicant participate in therapy and that his therapist provide reports to assist the Board in evaluating applicant's character, fitness, and risk of relapse. As noted, applicant now asks this court to admit him to practice.

The statutes and procedural rules relevant to applications for admission set the standard that applicant must meet. ORS 9.220 provides, in part:

"An applicant for admission as attorney must apply to the Supreme Court and show that the applicant:

"* * * * *

"(2)(a)  Is a person of good moral character and fit to practice law.

"(b)  For purposes of this section * * *, the lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial

doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation. The conduct or acts in question should be rationally connected to the applicant's fitness to practice law."

Rule for Admission of Attorneys (RFA) 9.45(6) provides:

"To be entitled to admission to the practice of law in Oregon, an applicant must establish by clear and convincing evidence that she or he has the requisite character and fitness to practice law."

RFA 1.05 provides, in part:

"(1) 'Fit to practice law,' sometimes characterized as 'fitness,' means an applicant demonstrates a level of conduct, mental health, judgment, and diligence that will result in adequate representation of the best interests of clients, including participation in the legal process according to the Disciplinary Rules of the Oregon Code of Professional Responsibility.

"* * * * *

"(3) 'Good moral character' is given the same meaning as contained in ORS 9.220(2)(b)."

As noted above, applicant bears the burden of proving his fitness by clear and convincing evidence. Stated differently, applicant must show that it is "highly probable" that he has the good moral character and fitness to practice law. *In re Monaco*, 317 Or 366, 370 n 4, 856 P2d 311 (1993). Any significant doubt should be resolved in favor of protecting the public by denying admission. *In re Jaffee*, 319 Or 172, 177, 874 P2d 1299 (1994).

There is no issue in this proceeding whether applicant's drug and alcohol history made him unfit, at some time in the past, to be admitted to the practice of law. It did, and applicant does not claim otherwise. Instead, the issue in this proceeding is one of rehabilitation: Has applicant shown by clear and convincing evidence that he has rehabilitated himself, and that there is no significant danger that he will relapse into some version of his former behavior? So stated, the issue is analogous to the issue that faced this court in *In re Rowell*, 305 Or 584, 754 P2d 905 (1988). In *Rowell*, this

court admitted an applicant who had used and sold marijuana while in college, resulting in a five-month jail term; had been charged with crimes resulting from drunken behavior; regularly had sold marijuana and amphetamines; had violated his probation by possessing drugs and leaving the jurisdiction; was involved in a drunk-driving crash that resulted in a cocaine-possession charge (two years before entering law school); and had smoked marijuana while in his first year of law school, thereby again violating his probation. *Id.* at 587-88.

The court in *Rowell* reviewed the applicant's evidence of current good character, including his decreasing drug and alcohol use, candor, letters of reference, regret for past actions, and participation in activities for the public good. *Id.* at 588-91. The court also reviewed the passage of time—four years[1]—since the applicant had engaged in his most recent "unacceptable conduct," namely, his most recent marijuana use while in law school, *id.* at 591-92. The court concluded:

> "The length of time without evidence of unsatisfactory character needed to permit the conclusion that the actor is now of good moral character varies with, among other things, the person's age, the length of time that the unsatisfactory characteristics were evident and the nature of the unacceptable behavior. In applicant's case, we find that four years without engaging in the activities that evidenced his former unsatisfactory character are sufficient to indicate that he has changed. His personal, academic, professional and other achievements in the last four years all support the conclusion that applicant now is of good moral character."

---

[1] We observe that, in *Rowell*, the "four year" period of drug abstinence includes the year between the Board's character and fitness review hearing and the issuance of this court's decision in the proceeding. The court's recitation of the facts does not disclose whether the court remanded the proceeding to the Board under RFA 9.60(6) for the admission of evidence of Rowell's conduct subsequent to the character hearing. If it did remand, the discrepancy is resolved. If not, the court's inadvertent inclusion of the additional year was not dispositive. In any event, neither party in the present case requested remand. Accordingly, we do not consider the time that has elapsed since the date of applicant's character and fitness review hearing in our evaluation of applicant's fitness.

*Id.* at 592. The court also found, as "[p]erhaps most convincing," that the applicant had demonstrated a slow and steady maturation process that predated his decision to attend law school. *Id.*

Here, applicant argues that he has presented persuasive evidence similar to that presented in *Rowell*, namely that: (1) he had been sober for three years at the time of the character and fitness review hearing; (2) he has been candid with the Board; (3) he regrets his past actions and has obeyed the law since becoming sober; (4) he has participated in the public good by helping other AA members in times of need; (5) many individuals have attested to his honesty, trustworthiness, good moral character, and commitment to sobriety; and (6) his earlier criminal conduct was the result of his chemical dependency, which he has overcome.

Applicant further argues that, because he "is addressing the relapse issue adequately" through AA, the Board's argument that he should undergo therapy is not well taken. Applicant also emphasizes that, contrary to the Board's view of the record, Cundill testified that applicant's relapse issues could be addressed in the AA context, rather than through therapy. Applicant further argues that the Board's recommendation (that applicant undergo therapy and that the Board be advised of the results) "could be a recipe for failure" because, in his view, as well as in the view of the Board's appointed psychologist, Pachter, therapy likely would be successful only if applicant could be assured complete confidentiality. Finally, applicant argues that the public would benefit from his admission to the Bar, as he is extremely conscientious and hard working, is honest and trustworthy, and has demonstrated other on-the-job attributes that will serve him well in practice.

In the Board's view, applicant's evidence fails in two respects: (1) insufficient passage of time; and (2) failure to participate in therapy. As to the passage of time, the Board contrasts *Rowell*, in which the applicant had stopped selling *drugs* eight years before applying for admission, had stopped using drugs other than marijuana five years before applying, and had stopped using marijuana more than two years before applying. Here, the Board points out, applicant's "most

recent unacceptable conduct" occurred in February 1998, well into applicant's second year of law school. The Board further points out that applicant's most recent misconduct included criminal drug use involving "very serious" drugs. The Board also points to applicant's relapse history as evidence that a greater passage of time should occur before applicant is admitted. As to therapy, the Board characterizes both Pachter's report and Cundill's testimony as supporting applicant's need to address the psychological issues underlying his drug and alcohol problems. Based on that evidence, the Board insists that it is essential for applicant to undergo the recommended psychotherapy in order to demonstrate his good character and fitness for practice.[2]

In our *de novo* review of the record, we find the two pieces of evidence that are most significant to the issue of applicant's fitness to practice to be Judge Herndon's testimony and Dr. Pachter's report. Not surprisingly, in close cases like the present one, those two pieces of evidence point in opposite directions.

On the one hand, Judge Herndon's wholehearted endorsement speaks well for applicant. Judge Herndon is sensitive to the considerations that enter into any decision to admit an applicant and it appears that he is entirely satisfied that applicant possesses the requisite moral character to be admitted now. In our view, however, two considerations detract somewhat from the judge's assessment: First, and although Judge Herndon stated that the information would not make a difference in his present view of applicant's character, it appears that the judge never was apprised of the full extent of applicant's drug use and its criminal aspects. Second, Judge Herndon has not known the applicant for very long and did not know him at all during any of the periods in which applicant had relapsed into drug use.[3]

---

[2] The Board emphasizes, however, that applicant's therapy sessions should remain confidential, with the exception of summary reports setting out the nature and goals of the therapy, the number of visits, and general findings and conclusions, to assist the Board's evaluation of applicant's risk of relapse.

[3] This is in contrast to *Rowell*, in which a judge for whom the applicant had worked also testified in his favor. In that case, the judge, who formerly had been a criminal defense lawyer and earlier had represented Rowell in a criminal case, was able to compare Rowell's previous and present character and to testify to Rowell's complete turnaround. 305 Or at 590.

On the other hand, there is Pachter's extensive psychological report. That report sets out salient points from applicant's history, noting that applicant's "most extensive drug use occurred between October 1997 [and] * * * February 1998, and involved primarily alcohol and methamphetamines." The report further noted that applicant has experienced intermittent periods of sobriety throughout his years of dependency. We find the following statement by Pachter particularly significant:

"[Applicant's] insistence that he is recovered from drug addiction, without obvious concern of relapsing is in keeping with his defensive style. Unfortunately, such an internal state of mind probably increases the risk of a relapse, since useful emotions, such as signal anxiety (i.e., worry or anxiety that something harmful might happen) are not as easily felt. This, with the tendency to rationalize or externalize events, further increases the risk."

We share those concerns. If, as Pachter observed, applicant does not have clear insight either into the reasons for his periodic, serious drug and alcohol abuse or the danger that he will relapse into such behavior, there are substantial doubts as to whether he now has the requisite character to be admitted.[4]

We also are concerned that applicant's most recent drug use was the most serious of his entire history. That trend is the opposite of the one that this court relied on in *Rowell* as an indication of maturation. Moreover, less time has passed since that last relapse than had passed when the applicant in *Rowell* applied for admission to the Bar.[5] It may

---

[4] At the same time, we reject the Board's assertion that applicant cannot establish his good character and fitness without undergoing psychotherapy. It might be true, as the Board's argument assumes, that having applicant undergo therapy would benefit both applicant (directly) and the Board (indirectly, by providing more information respecting the crucial issue of applicant's character), should applicant be denied admission now but then reapply. If (as we ultimately hold) applicant is to be denied admission, then it will be up to him to decide what course of action to follow if he wishes to apply again in the future. We do not consider it appropriate to dictate to an applicant how he or she should approach a future hypothetical reapplication, or what evidence the applicant should marshal in support of that application.

[5] We do not suggest that there is any particular minimum period of rehabilitation that an applicant must show. We simply conclude that, *on this record* of serious substance abuse, the passage of time is too short to satisfy us.

be, as one witness testified, that the passage of time increases the likelihood that applicant will not relapse and that the amount of time that has passed here is encouraging. But we must deal with this proceeding on the record that is before us. We do not find that the period between applicant's last drug use and the closing of the record in this matter—nearly three years—is sufficient to overcome the concerns that applicant's psychological profile and history of past relapses have generated. In sum, applicant has not satisfied us by clear and convincing evidence that such relapses are unlikely. It follows that applicant has not demonstrated that he presently possesses the requisite good moral character and fitness for admission to the Bar.

As noted, the Board recommends that applicant's request for admission to the Bar be denied, with permission to reapply after one year. We see no need to grant such leave, in view of the fact that, as we read the rules for admission, applicant is now eligible to reapply, should he wish to.

Applicant's application for admission to the Oregon State Bar is denied.